[Cite as *In re J.P.*, 2016-Ohio-5351.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: J.P.

:
:
:    Appellate Case No. 27093
:
:    Trial Court Case No. 2012-5647
:
:    (Appeal from Common Pleas Court-
:    Juvenile Division)
:
:

. . . . . . . . . .

O P I N I O N

Rendered on the 12th day of August, 2016.

. . . . . . . . . .

MATHIAS H. HECK, JR., by HEATHER JANS, Atty. Reg. No. 0084470, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
      Attorney for Appellee

CHARLES SLICER, III, Atty. Reg. No. 0059927, 111 West First Street, Suite 518, Dayton, Ohio 45402
      Attorney for Appellant

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} In this case, Appellant, L.P. ("Mother"), appeals from a judgment terminating her parental rights over her minor child, J.P. In support of her appeal, Mother contends that the trial court erred in granting permanent custody of J.P. to Appellee, Montgomery County Children Services ("MCCS"), because MCCS failed to prove by clear and convincing evidence that awarding permanent custody to MCCS was in J.P.'s best interest.

{¶ 2} Mother also contends that the trial court erred in awarding permanent custody to MCCS because the agency failed to prove that it made reasonable efforts to reunify the family. Finally, Mother contends that her trial counsel rendered ineffective assistance because counsel failed to object to the permanent custody trial going forward, given the limited amount of time that Mother had to complete therapy.

{¶ 3} We conclude that the trial court did not err in awarding permanent custody to MCCS, as the custody award was in J.P.'s best interests. MCCS also made reasonable efforts to reunify the family prior to the permanent custody hearing. We further conclude that Mother's counsel did not act ineffectively in failing to object to the fact that the custody hearing went forward a few months after Mother received recommendations for therapy. Mother was well aware that mental health issues were part of her case plan from the beginning, and she had ample time to comply with her case plan requirements. However, she made little to no effort to complete any requirements. Mother also made no effort to act on recommendations for counseling. Accordingly, the judgment of the trial court will be affirmed.

## I. Facts and Course of Proceedings

{¶ 4} According to the evidence, Mother had six children, and had been involved with MCCS since about 2000. At that time, MCCS was given temporary custody over several of Mother's children. Mother indicated at trial that her involvement in 2000 arose from her husband's violence in the home against a child. Mother also had a history of abusive relationships with men. For example, in 2008, a boyfriend pushed her out of a window, and she was severely injured. One of her children had also received a gunshot wound in 2010, while in Mother's home and under Mother's care.

{¶ 5} J.P., a male child born in July 2009, is the subject of this case. On July 31, 2012, MCCS filed a neglect and dependency complaint involving J.P., alleging grounds under R.C. 2151.03(A)(2) and R.C. 2151.04(B), (C), and (D). The grounds included that J.P. lacked adequate parental care by reason of the mental or physical condition of his parents. The complaint noted Mother's unstable housing and substance abuse issues, and stated that MCCS had been involved with the family for two years, providing supporting services. Concerns included unstable housing, lack of food, utilities being shut off, lack of supervision, Mother's health concerns, reports of domestic violence between Mother and a paramour, allegations of drug use, and allegations of several children that they (Mother and the paramour) were abusing drugs and alcohol. Similar complaints were filed regarding Mother's other five children, and, ultimately, a child of one of Mother's 17-year old twins. At the time the complaint concerning J.P. was filed, Mother's children ranged in age from 17 years old to three years old. J.P. was her youngest child.

{¶ 6} At a hearing held on August 15, 2012, the court concluded that Mother was

not in a position to care for the children, and Mother agreed that J.P. should be placed in the temporary custody of his maternal grandmother, G.P. Four siblings were placed in the temporary custody of MCCS, and Mother's remaining child was placed in the temporary custody of a half-sibling, M.G.. The half-sibling and that child shared the same father.

{¶ 7} When the complaint was filed, an individual named D.W. was thought to be J.P.'s father. However, D.W. was later excluded through DNA testing.

{¶ 8} In early September 2012, the court granted temporary custody of J.P. to MCCS, based on concerns with G.P.'s background check and lack of space. J.P. was then placed in a foster home with some of his siblings.

{¶ 9} A guardian ad litem ("GAL") was appointed and filed a report on October 10, 2012, recommending that MCCS receive temporary custody of six children, including Mother's grandchild, and that M.G. retain temporary custody of the remaining child.[1] The GAL further recommended that the children, including J.P., have weekly two-hour visits with Mother at MCCS.

{¶ 10} In addition, the GAL noted that Mother had serious health issues, including lung problems and leg problems resulting from hip surgery in 2008 that prevented her from providing for the children. Mother was scheduled for in-patient surgery on October 12, 2012, and would be in the hospital for some time. The GAL also stressed Mother's history of being unable to provide food, clothing, adequate housing, and supervision for the children; concerns about domestic violence between Mother and a male (J.G.);

---

[1] The grandchild was born in 2011, and, as noted, was the child of one of Mother's twins.

reports that J.G. was involved in human trafficking; and concerns about Mother's suspected alcohol and drug abuse.

**{¶ 11}** On October 31, 2012, the trial court filed an order of adjudication and disposition of temporary custody, based on a hearing that was held on October 10, 2012. The court found J.P. neglected and dependent, and granted temporary custody to MCCS, with custody to expire on July 18, 2013. At that time, the court again mentioned the concerns listed above. A case plan filed at the time also stressed concern with mother's mental health, and indicated, as one of the goals, that Mother would participate in mental health counseling, if needed, and would follow through with recommendations of the evaluations. Additional items were included, like obtaining income sufficient to meet the family's needs, demonstrating an ability to pay rent on a monthly basis, maintaining food and utilities for the family, and not allowing drugs or drug paraphernalia in the home.

**{¶ 12}** In January 2013, MCCS filed an amended case plan, based on a semi-annual review. The amended plan added a parenting/psychological assessment, domestic violence education classes, and visitation. The plan indicated that Mother would participate in a mental health assessment and follow any treatment recommendations, and that Mother would participate in domestic violence classes through Artemis and follow any recommendations. In addition, the plan noted that Mother had hip surgery in October 2012, and had not visited the children since before the surgery. Ultimately, the psychological assessment was placed on hold because Mother reported that she was bedridden and could not travel.[2]

---

[2] Mother denied this at the permanent custody hearing, and also denied that she was even aware of her case plan. The magistrate who heard the testimony did not find Mother credible.

{¶ 13} Mother moved to Georgia at the beginning of May 2013. On May 23, 2013, MCCS moved for a first extension of temporary custody or, alternatively, legal custody to Mother. MCCS noted that it had requested that Mother's county in Georgia conduct a home study to audit Mother's house for appropriateness. MCCS further indicated that if the house were found appropriate, MCCS might move the children in with Mother when the school year ended. However, the home study failed.

{¶ 14} On August 26. 2013, the court granted a temporary custody extension to MCCS, following a hearing that had been held on August 14, 2013. Mother did not appear for the hearing. In the decision, the court observed that Mother had not maintained consistent contact with the children and was not in a position to care for the children. MCCS's temporary custody was extended to January 31, 2014. In November 2013, the court accepted an amended case plan removing Mother from the concerns in the case plan because Mother lived in Georgia and the caseworker was not able to see Mother since she lived out of state. The case plan noted that Mother lived out of state and had no contact with the children.

{¶ 15} On November 22, 2013, MCCS filed a motion and affidavit seeking permanent custody. An affidavit supporting the motion noted that Mother's visits with her children at the agency had stopped in October 2012, that Mother and children saw each other outside the agency prior to Mother's move, but there had been no visits since Mother moved in May 2013. The affidavit further stated that Mother had not completed objectives of maintaining stability and resources sufficient to meet her needs and those of her children, and that Mother had moved to a second house in Georgia since May 2013, which raised concern. In addition, the affidavit stated that MCCS continued to

have concern with Mother's mental health and lack of visitation or effort with the children.

{¶ 16} In January 2014, the GAL recommended that MCCS retain temporary custody of J.P. until Mother could complete her plan objectives. An additional report filed by the GAL on March 13, 2014 mentioned that after a visit with Mother at a McDonald's restaurant, one of the children returned home appearing "under the influence" or otherwise "high." This child was the one who had received a gunshot wound in 2010 while in Mother's home and in Mother's care.[3]

{¶ 17} MCCS withdrew its motion for permanent custody at the hearing held in March 2014, and the court granted a second extension of temporary custody. In its decision, the court commented that Mother had not addressed housing and income objectives in her plan, along with mental health and substance abuse issues. A case plan filed in late March 2014 again stated that Mother would participate in a mental health assessment and follow any recommendations.

{¶ 18} On June 9, 2014, MCCS filed a second motion and affidavit seeking permanent custody of J.P. The affidavit indicated that a second home study had been conducted in Georgia in March 2014 on Mother's home. However, the home study failed for lack of financial resources of Mother to support the children, and because Mother had tested positive for marijuana.

---

[3] This visit occurred on March 12, 2014, the day before a scheduled hearing on MCCS's motion for permanent custody, which was withdrawn and subsequently refiled in June 2014. Mother's visits with J.P. occurred when she came into town for hearings. According to MCCS, Mother had five two-hour agency visits with J.P. since he came into custody in July 2012. These visits occurred in March 2014, July 2014, September 2014, November 2014, and January 2015. At the permanent custody hearing held in April 2015, Mother testified that she had seen J.P. ten times, rather than five, between March 2013 and April 2015. She offered no evidence to verify this, however.

{¶ 19} In addition, the affidavit stated that the second extension of temporary custody was set to expire on July 31, 2014, and that Mother did not visit the child regularly or consistently. The affidavit also noted that Mother claimed to have moved to Georgia to establish a better life for herself and the children, but had been unable to do so. Furthermore, Mother's inability to provide for the basic needs of herself and her children had persisted for the thirteen years MCCS had been involved with Mother.

{¶ 20} In July 2014, the court set a September 2014 hearing on the permanent custody motion. A GAL report filed in September 2014 recommended that MCCS be granted permanent custody. The report noted that Mother was a stranger to J.P., that Mother had moved out of state, and had she chosen not to work her case plan from Georgia. Mother had visited J.P. very little and had failed two home studies.

{¶ 21} The permanent custody hearing was continued a few times due to service issues, discovery issues, and schedule conflicts. A semiannual review filed in November 2014 indicated that D.W. had been ruled out as a father for J.P., and another potential father, D.J., had been identified. D.J. was interested in taking a paternity test, but was not interested in custody. However, he never completed the test, and did not appear at any of the hearings. In addition, the review noted that Mother was supposed to come to Dayton in November for a psychological/parenting assessment, which the magistrate had wanted.

{¶ 22} Dr. Richard Bromberg conducted a psychological evaluation and parenting assessment in November 2014, and testified at the permanent custody hearing, which was held on April 23, 2015. He also observed Mother with J.P.

{¶ 23} Dr. Bromberg had some difficulty making a specific psychological diagnosis

due to Mother's understatement of her symptoms and great minimization of psychological behavior and problems on the standardized tests she was given. The implication was that Mother was not being truthful or was in denial about her problems. Among other things, Dr. Bromberg found a disconnect between the result on the Substance Abuse Subtle Screening Inventory, which indicated Mother had a low to moderate probability of having a substance abuse dependence disorder. However, Mother reported on the test that she had no history of substance abuse.

{¶ 24} According to Dr. Bromberg, a parenting stress test was one of the few tests where Mother had accurately represented herself. This test indicated that Mother had significant attachment issues with J.P., that she had a limited support system, and that multiple issues interfered with her ability to parent. Based on this test, Dr. Bromberg had very definite concerns about Mother's ability to parent. He stated that the information Mother provided indicated she had a lack of basic parenting information. He was also concerned about Mother's significant lack of attachment with her children, with whatever her substance abuse problem was, with her unhappiness, and her history of being abused and victimized and how that might affect the children under her care.

{¶ 25} In discussing his observation of Mother and three of the siblings, including J.P., Dr. Bromberg stated that "It wasn't a warm – was not a warm interaction." Transcript of April 23, 2014 Permanent Custody Hearing, p.38. Dr. Bromberg made a principal diagnosis of unspecified mental health disorder and provisional diagnoses of depression, post-traumatic stress disorder, and substance abuse disorder.

{¶ 26} Dr. Bromberg gave MCCS recommendations to address these concerns, including that Mother undergo group and individual therapy for an extended period of

time, up to 24 months; random drug testing; family therapy; parenting skills training; specialized treatment for Mother to help with potential post-traumatic stress disorder from the abuse she had incurred; behavioral-oriented pain management as a better alternative than the continued use of Vicodin, which can be addictive and interfere with functioning; and education on how to prevent being abused. Dr. Bromberg also concluded that Mother's diagnosis would interfere with her ability to parent J.P. effectively, and stated that she would not effectively be able to protect J.P.

{¶ 27} MCCS sent Mother Dr. Bromberg's recommendations in February 2015, but Mother took no action on any of his recommendations prior to the custody hearing on April 23, 2015. An amended case plan was filed, incorporating these recommendations on February 18, 2015, and the court approved the amended case plan on March 19, 2015.

{¶ 28} In the meantime, in early December 2014, Mother received information that one of her daughters had been sexually assaulted. Mother did not notify MCCS; instead, MCCS only learned about it a month later, from someone else who reported it. When the MCCS caseworker approached Mother about the sexual abuse, Mother said she already knew about it.

{¶ 29} In April 2015, the GAL filed another report. In this report, the GAL noted that one of Mother's children had reported that Mother had a boyfriend in Georgia. The GAL was concerned because inappropriate men had been an issue for Mother in the past. Mother denied she had a boyfriend, and accused one of her children (who had not made the report) of lying. The GAL had also interviewed the children as to their wishes, and J.P., who was in Kindergarten, expressed a desire to live with his current foster

parent.   The GAL recommended that MCCS be given permanent custody of J.P.

**{¶ 30}** As was noted, a permanent custody hearing was held on April 23, 2015. After hearing testimony from Dr. Bromberg, from the current MCCS caseworker, and from Mother, the magistrate filed a decision concluding that MCCS should be granted permanent custody of J.P.   Mother filed objections to the magistrate's decision on June 2, 2015, and supplemental objections on February 8, 2016, following the preparation of the transcript.   The trial court then issued a decision in April 2016, overruling the objections and granting permanent custody of J.P. to MCCS.   Mother now appeals from the judgment of the trial court.


## II.   Was a Grant of Permanent Custody in J.P.'s Best Interest?

**{¶ 31}** Mother's First Assignment of Error states that:

> The Trial Court Erred in Granting Permanent Custody to Montgomery
>
> County Children Services Because that Agency Failed to Prove by Clear
>
> and Convincing Evidence that Permanent Custody Was in the Best Interest
>
> of the Minor Children.

**{¶ 32}** Under this assignment of error, Mother contends that reunification was a possibility at the time of the permanent custody hearing on April 23, 2015, and that a finding of permanent custody is not supported by reviewing the factors set forth in R.C. 2151.414(D).

**{¶ 33}** Parents have a fundamental right "to make decisions concerning the care, custody, and control of their children*."*  (Citations omitted.)   *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).   "In a proceeding for the termination of

parental rights, all of the court's findings must be supported by clear and convincing evidence." *In re M.S.*, 2d Dist. Clark No. 2008-CA-70, 2009-Ohio-3123, ¶ 15, citing R.C. 2151.414(E) and *In re J.R.*, 2d Dist. Montgomery No. 21749, 2007-Ohio-186, ¶ 9. "Clear and convincing evidence is that measure or degree of proof which * * * will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 34} "However, the court's decision to terminate parental rights will not be overturned if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re Forrest S.*, 102 Ohio App.3d 338, 344-345, 657 N.E.2d 307 (6th Dist.1995). "We review the trial court's judgment for an abuse of discretion." *Id.*, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (which applied an abuse of discretion standard to the trial court's findings under R.C. 2151.414).

{¶ 35} We have also stressed that "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact. In this regard, '[t]he underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *In re A.J.S.*, 2d Dist. Miami No. 2007-CA-2, 2007-Ohio-3433, ¶ 22, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461

N.E.2d 1273 (1984).

{¶ 36} "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency." (Citation omitted.) *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14. Specifically, the court must find by clear and convincing evidence that: "(1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *Id.*, citing *In re K.M.*, 8th Dist. Cuyahoga No. 98545, 2012–Ohio–6010, ¶ 8, and R.C. 2151.414(B)(1).

{¶ 37} There is no dispute in the case before us that J.P. had been in MCCS's temporary custody for 12 or more months of a consecutive 22-month period. As a result, we are only required to consider whether the evidence supports the court's findings about J.P.'s best interests. *In re K.S.*, 2d Dist. Montgomery No. 26701, 2015-Ohio-4117, ¶ 8.

{¶ 38} Concerning a child's best interests, "R.C. 2151.414(D) directs the trial court to consider all relevant factors * * * including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or

more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.* at ¶ 15.

{¶ 39} In discussing the trial court's decision, Mother primarily challenges the court's findings with respect to whether she completed her case plan. Basically, Mother contends that she never had an opportunity to follow up with the psychological recommendations; that she moved to Georgia to better herself and secure housing, and had appropriate housing; that she was investigating schools in the area where she lived and had a family support system in the area; that she was willing to provide food, clothing and shelter; that the record lacks any indication that she was ordered to provide financial support; that she did visit the child; that she did not intend to abandon J.P.; and that she made every effort she could to comply with her case plan.

{¶ 40} The trial court thoroughly considered each factor in R.C. 2151.414(D). Regarding the child's interaction and interrelationship with parents, foster-care providers, relatives, and other persons who may significantly impact the child, the court noted that J.P. was originally placed with G.P., his maternal grandmother, but was removed and placed in foster care in September 2012. J.P. was transferred to a second foster home in February 2015 because his prior foster parents decided they were no longer able to foster children. The court observed that J.P. was doing well in this placement, fit in well, and liked his foster mother very much. In contrast, while Mother stated that she had a strong bond with the child, other observers, including Dr. Bromberg, the caseworker, and the GAL, found the relationship was not close. In addition, J.P.'s alleged father had

never visited him and did not even know the child's correct first name. There is clear and convincing evidence in the record to support these findings under R.C. 2151.414(D)(1)(a).

**{¶ 41}** Regarding R.C. 2151.414(D)(1)(b) (the child's wishes), the court observed that J.P. had expressed a desire to live with his current foster mother or his prior foster mother. His biological mother was his third choice. Again, the evidence supports these findings.

**{¶ 42}** Regarding custodial history, the court observed that J.P. had been in the agency's temporary custody since he was removed from his grandmother's care in September 2012. R.C. 2151.414(D)(1)(c). There is no dispute in the evidence about this finding.

**{¶ 43}** R.C. 2151.414(D)(1)(d) considers "[t]he child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency." In connection with this factor, the court discussed in detail the positions of the parties and the testimony of Dr. Bromberg, and concluded that Mother had failed to complete her case plan objectives. We agree with the trial court.

**{¶ 44}** Although Dr. Bromberg's recommendations were made later in the case, Mother made no attempt to even begin to implement any of his recommendations. Furthermore, the case plan objectives were apparent from the beginning of the case, and Mother did very little or nothing to satisfy them. Instead of working with MCCS, Mother moved several states away, which made consistent visitation and assistance with Mother's situation very difficult.

**{¶ 45}** According to the testimony of the MCCS caseworker, which is not

contradicted, Mother did not see J.P. at all between early May 2013 and March 2014. In addition, the caseworker testified that Mother then had five visits of two hours each, over the next year. This is a total of 10 hours in around two years.

{¶ 46} Even if one credits Mother's testimony (and there is no supporting evidence of Mother's statements), Mother saw J.P., a very young child, only ten times over the course of almost two years after she moved away in May 2013. As was noted, the GAL indicated in September 2014 that Mother was a stranger to J.P.

{¶ 47} As an additional matter, Dr. Bromberg testified that Mother lacked basic parenting information and could not identify very extensively the needs of her individual children. He had very definite concerns about her ability to parent. Also concerning is Mother's failure to react appropriately to protect a child who had been sexually assaulted during the pendency of the case.

{¶ 48} Moreover, although Mother moved to Georgia ostensibly to provide for her children, she failed two home studies by the Georgia agency. Over the course of almost three years from the time that J.P. was removed from Mother's home, Mother did almost nothing to establish that she could provide a legally secure placement for her children or effectively parent and protect her children.

{¶ 49} Mother had not been employed since her injury in 2008, and was on a limited disability income of about $733 per month at the time of trial. This amount was not sufficient to meet Mother's expenses for herself each month. And, while Mother stated that she could work up to 20 hours per week and still collect her Social Security benefits, she offered no evidence of what income, if any, she was able to make. The trial court expressed particular concern over this situation. Doc. #7, Decision and

Judgment Concerning Objections to the Decision of the Magistrate, p. 6.

{¶ 50} No other individuals were available or willing to care for J.P. The second alleged father, D.J., never completed paternity testing, and was not interested in assuming custody. G.P., the maternal grandmother who initially took temporary custody of J.P. in July 2012, was not suitable. A home study of G.P. completed in January 2015 failed due to criminal background and G.P.'s history with the agency. In addition, Mother told Dr. Bromberg that she had been physically and sexually abused by G.P.

{¶ 51} In view of the above evidence, the trial court did not err in concluding that J.P. needed a legally secure placement and that it could not be accomplished without granting MCCS permanent custody.

{¶ 52} R.C. 2151.414(D)(1)(e) also requires the court to consider whether any additional factors listed in R.C. 2151.414(E)(7)-(11) apply. In this regard, the court found that R.C. 2151.414(E)(10) applied. This factor states that "[t]he parent has abandoned the child."

{¶ 53} In particular, the court noted that pursuant to R.C. 2151.011(C), " 'a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days.' " Doc. #7, Decision and Judgment Concerning Objections to the Decision of the Magistrate, p. 8. The court stressed that Mother did not visit with the child from May 2013 until March 2014, and that D.J. had never visited nor had any contact with the child. The court, therefore, found that J.P. had been abandoned. *Id.* In view of our prior discussion, we agree with the trial court that the parents abandoned J.P.

{¶ 54} Additionally, pursuant to the direction under R.C. 2151.414(E)(16) that the court may consider any other relevant factor, the court discussed the fact that Mother had been involved with the agency since 1995, and that she had five other children other than J.P., none of whom were in her custody. The court also stressed the concern of Dr. Bromberg and the agency about Mother's history of being abused and victimized and whether Mother could protect children in her care. In this context, the court noted the fact that one daughter had suffered a gunshot wound in 2010 while in Mother's care; the fact that the same daughter returned under the influence of marijuana after visiting mother at McDonald's; and the fact that Mother failed to report sexual abuse of a daughter for about a month before MCCS became aware of it. Thus, the court shared the agency's concern over whether Mother could adequately care for, protect, and supervise J.P. if he were returned to her custody. Doc. #7, Decision and Judgment Concerning Objections to the Decision of the Magistrate, pp. 9-10.

{¶ 55} Finally, the court discussed its concern over Mother's involvement with a man that MCCS knew nothing about, given Mother's past history of involvement with males and abusive relationships. *Id.* at p. 10. Again, given the record and testimony, we agree that these findings are supported by clear and convincing evidence.

{¶ 56} Accordingly, the trial court did not err in concluding that awarding permanent custody to MCCS was in J.P.'s best interests. The First Assignment of Error, therefore, is overruled.

### III. Did MCCS Fail to Prove Reasonable Efforts?

{¶ 57} Mother's Second Assignment of Error is as follows:

The Trial Court Erred in Granting Permanent Custody to Montgomery

County Children Services Because that Agency Failed to Prove

Reasonable Efforts.

{¶ 58} Under this assignment of error, Mother relies on her prior arguments in support of the First Assignment of Error. She also argues that she should have been allowed an opportunity to participate in therapy before the court decided that reunification was not possible. For the reasons previously stated, this assignment of error is without merit.

{¶ 59} As MCCS notes, "the specific requirement to make reasonable efforts that is set forth in R.C. 2151.419(A)(1) does not apply in an R.C. 2151.413 motion for permanent custody." *C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 4. In *C.F.*, the court also stated that:

> R.C. 2151.419(A)(1) does not apply in a hearing on a motion for permanent custody filed pursuant to R.C. 2151.413. However, except for some narrowly defined statutory exceptions, the state must still make reasonable efforts to reunify the family during the child-custody proceedings prior to the termination of parental rights. If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time.

*Id.* at ¶ 43. *Accord In re A.D.*, 2d Dist. Miami No. 2007 CA 23, 2008-Ohio-2070, ¶ 7.

{¶ 60} A review of the docket indicates that, prior to the permanent custody hearing, the trial court repeatedly found that MCCS had made reasonable efforts to provide services, but that the agency's efforts did not prevent J.P.'s removal, nor did the

efforts make it possible for J.P. to return home.   *See* Doc. #93, p. 1; Doc. #88, p. 1; Doc. #76, p. 1; Doc. #74, p. 1; Doc. #66, p. 1; Doc. #59, p. 1; Doc. #47, p.1; and Doc. #46, p.1. Mother never objected to any of these findings.

{¶ 61} Moreover, we see no evidence that MCCS failed to provide services required by the case plan.   At every step of the proceeding, MCCS provided Mother with case plan management, referrals, and services, but Mother failed to take advantage.   In addition, no one precluded Mother from participating in therapy; she simply made no attempt.

{¶ 62} Based on the preceding discussion, the Second Assignment of Error is overruled.

IV.   Was Appellant's Counsel Ineffective?

{¶ 63} Mother's Third Assignment of Error states that:

Appellant's Counsel Was Ineffective.

{¶ 64} Under this assignment of error, Mother contends that trial counsel provided ineffective assistance of counsel by failing to object to the proceedings going forward, given the limited amount of time that Mother had to complete the 24 months of therapy recommended by Dr. Bromberg.

{¶ 65} "The familiar two-part test for establishing ineffective assistance in criminal cases is equally applicable in permanent custody proceedings."   *In re T.P.*, 2d Dist. Montgomery No. 20604, 2004-Ohio-5835, ¶ 45, citing *Jones v. Lucas County Children Services Bd.*, 46 Ohio App.3d 85, 86, 546 N.E.2d 471 (6th Dist.1988).   Consequently, Mother "must establish that her attorney provided deficient representation and that

counsel's deficient performance prejudiced her." *Id.*, citing *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), and *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "In order to establish prejudice, [Mother] must show a reasonable probability that but for counsel's deficiencies the result of the proceeding would have been different." *Id.*

{¶ 66} Our review of the proceedings indicates that trial counsel did not provide deficient representation. Mother had been involved with MCCS for about thirteen years, and the current involvement had been ongoing for nearly three years prior to the permanent custody hearing, i.e., from July 2012 to April 2015. Mother had ample time to demonstrate that the children should be reunified with her, but did very little. Instead of staying in the vicinity of J.P. and working on her case plan, Mother moved far away, which made having a relationship with J.P. very difficult. As the GAL noted, Mother was a stranger to J.P.

{¶ 67} Mother also made no effort to even begin to implement any of Dr. Bromberg's recommendations. This was consistent with her conduct throughout the case. In particular, Mother knew from the beginning of her case plan that mental health issues were a concern, yet did nothing. She also did little, if anything, to accomplish the rest of the case plan requirements.

{¶ 68} As a result, even if trial counsel had asked for a continuance, there is no indication that the trial court would have granted it, or that if it had been granted, Mother would have done anything to advance her situation. As Dr. Bromberg noted, Mother minimized her problems, denied that she had any substance abuse issues (despite evidence to the contrary), denied she had mental health issues (again, despite evidence

to the contrary), and had limited insight and judgment.

**{¶ 69}** We also note that MCCS withdrew a prior motion for permanent custody, which gave Mother additional time to establish that she could parent her children and satisfy her case plan requirements. The affidavit supporting the second motion for permanent custody noted that Mother had made no recent progress on her case plan.

**{¶ 70}** Furthermore, as the State points out, the trial court was not required to consider whether reunification could take place within a reasonable time, since J.P. had been in the agency's custody for more than 12 of 22 consecutive months. The court was only required to consider whether permanent custody was in J.P.'s best interests. As was noted, the trial court's decision on J.P.'s best interests was supported by clear and convincing evidence.

**{¶ 71}** Accordingly, the Third Assignment of Error is overruled.

## V. Conclusion

**{¶ 72}** All of Mother's assignments of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

DONOVAN, P.J. and HALL, J., concur.

Copies mailed to:

Mathias H. Heck, Jr.
Heather Jans
Charles Slicer, III
Cristy Oakes
D.J.
Hon. Nick Kuntz