[Cite as *In re E.S.*, 2017-Ohio-219.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

IN THE MATTER OF: E.S., D.H., and
K.H.

:
:
:          Appellate Case No. 2016-CA-36
:
:          Trial Court Case Nos. 2015-459, 2015-
:          460, and 2015-461
:
:          (Appeal from Domestic Relations
:          Court)
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 20th day of January, 2017.

. . . . . . . . . .

MEGAN M. FARLEY, Atty. Reg. No. 0088515, Assistant Prosecuting Attorney, Clark
County Prosecutor's Office, 50 East Columbia Street, Fourth Floor, Springfield, Ohio
45502
    Attorney for Appellee-Clark County Department of Job and Family Services

JENNIFER S. GETTY, Atty. Reg. No. 0074317, 7501 Paragon Road, Dayton, Ohio 45459
    Attorney for Appellant-J.D.

. . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Appellant, J.D. ("Mother"), appeals from the judgment of the Clark County Court of Common Pleas, Juvenile Division, terminating her parental rights and granting permanent custody of her three children to the Clark County Department of Job and Family Services ("CCDJFS"). For the reasons outlined below, the judgment of the juvenile court will be affirmed.

## Facts and Course of Proceedings

{¶ 2} Mother has three children, nine-year old E.S., six-year-old D.H., and four-year-old K.H. The record indicates that E.S.'s father is incarcerated in California and was not involved in any of the custody proceedings at issue. At all relevant times, except for a brief period between November 2015 and January 2016, Mother was in a relationship with D.H. and K.H.'s father ("Father"). Mother and Father resided together in Springfield, Ohio, and were engaged to be married. Father, however, died sometime after the juvenile court entered its judgment granting permanent custody of E.S., D.H., and K.H. to CCDJFS. Father's cause of death is not apparent from the record.

{¶ 3} CCDJFS first became involved with E.S., D.H. and K.H. in August 2013, when officers from the Springfield Police Department found E.S., who was five years old at the time, attempting to cross South Limestone Street by himself in his pajamas. E.S. reported to the officers that he was looking for food for his family because he was hungry. Upon returning E.S. home, the officers found that he and his family lived in poor conditions. Specifically, the officers observed that there was very little food in the house, the house was in disarray, there was no furniture, stove or refrigerator, and that two of

the children were sleeping on the floor. In addition, E.S. and D.H.'s bodies were covered with fleabites that were bloodied from their scratching. K.H. also had two fleabites on his back and diaper rash from poor hygiene. Mother told the officers that the bites had been there for a week and that she believed they were chicken pox. At the time of this incident, Father was in Oklahoma working on an oil rig. Father moved to Ohio a week later.

{¶ 4} Due to the condition of the home and that of the children, on August 16, 2013, the trial court granted an emergency removal of the children from Mother and Father's home. The removal was extended in September 2013, after Mother and Father agreed to the children being put in the temporary custody of CCDJFS.

{¶ 5} After their removal, the children were assessed at the Rocking Horse Community Health Center ("Rocking Horse") where it was discovered that they all had developmental delays and medical conditions. Specifically, E.S. had a mild cognitive delay, was underweight, and was diagnosed with ADHD, post-traumatic stress, and reactive attachment disorder. D.H. was determined to have severe global developmental delay, which affected his speech, motor skills, and cognitive ability. At four years of age, D.H. could not walk on stairs, nor was he potty trained. K.H., who was 14 months old at the time, had similar developmental delays as D.H. K.H. could not crawl and he was diagnosed with macrocephaly (enlarged head), which was attributable to neglect. In addition, all three children had severe vision problems.

{¶ 6} Following their removal from Mother and Father's home, the children were placed in foster care for 15 months, during which time they received extensive professional treatment. E.S. received mental health therapy at Rocking Horse, medication for his various mental health disorders, and was also enrolled in the Perrin

Woods School where he received mentoring. D.H. received mental health, speech, occupational, and physical therapies at Rocking Horse and was enrolled in the Clark Preschool Special Education Program where he made developmental strides. K.H. received speech, occupational, and physical therapies at Rocking Horse, was treated at Children's Hospital for his macrocephaly, and was enrolled in the Early Head Start Program, where he received further treatment for his developmental delays. In addition, all three children received eye patches and glasses to correct their vision problems, which improved over time. Overall, the children made great progress during their initial 15 months in foster care.

{¶ 7} While the children were in foster care, Mother and Father participated in programs at Rocking Horse to help them understand and address the needs of their children, including individual and family therapy. Father specifically worked on addressing his issues with anger. On December 15, 2014, the children were returned to Mother and Father for a 30-day visitation period. Thereafter, legal custody was returned to Mother and Father on January 15, 2015, and the case was closed.

{¶ 8} Approximately one month later, during an unannounced home visit on February 27, 2015, a CCDJFS caseworker discovered that the condition of Mother and Father's home had declined and that Mother and Father had regressed to previous patterns of behavior. The caseworker observed that the home was a "disaster" with "trash all over the place." Trial Trans. Vol. II (Apr. 21, 2016), p. 29. Father blamed the condition of the home on the children and was very angry that the caseworker had visited. The caseworker also learned that E.S. had missed eight days of school while in his parents' care.

{¶ 9} Shortly thereafter, Early Head Start called CCDJFS and reported that K.H. was not attending the program, which was imperative for his development. When CCDJFS asked Mother why K.H. was not attending Head Start, Mother advised that she did not believe it was necessary and that she wanted to bond with K.H. instead. Father also reported that riding the bus with K.H. to and from Head Start everyday took too much of his time.

{¶ 10} CCDJFS also learned that Mother had not been filling the children's prescriptions and giving them their medication regularly. The children were also found to be without their glasses, which caused their eyesight to again worsen. The children's behaviors and developmental strides were also regressing, particularly E.S., who was kicked out of school regularly due to his bad behavior.

{¶ 11} On April 13, 2015, four months after being returned to Mother and Father, the children were once again removed from Mother and Father's home after the family therapist at Rocking Horse reported that Father had physically abused the children. It was reported that Father became angry and struck K.H. in the mouth, busting his lip, and choked E.S. with a necklace he was wearing. The juvenile court granted an order for temporary shelter and care to CCDJFS, and the children returned to foster care. A guardian ad litem ("GAL") was appointed to the children shortly thereafter on April 16, 2015. Counsel was appointed to Mother on April 30, 2015. After a hearing on the matter, temporary custody was once again granted to CCDJFS on May 20, 2015.

{¶ 12} After unsuccessfully searching for a relative to place the children with, on January 28, 2016, CCDJFS filed a motion for permanent custody of the children pursuant to R.C. 2151.413(D)(1). The motion was tried before the juvenile court on April 7 and

April 21, 2016. At trial, the juvenile court heard testimony from various witnesses, including the professionals who evaluated and provided the family with counseling and treatment, the GAL, the CCDJFS caseworker, the CCDJFS visitation specialist, and both Mother and Father. Following trial, the juvenile court granted permanent custody to CCDJFS and terminated all of Mother and Father's parental rights and duties. As previously noted, Father died a short time thereafter.

{¶ 13} Mother now appeals from the juvenile court's judgment granting permanent custody to CCDJFS and terminating her parental rights, raising five assignments of error for review.

**First and Second Assignments of Error**

{¶ 14} For purpose of clarity and convenience, Mother's First and Second Assignments of Error will be addressed together. They are as follows:

I.    THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY FINDING THAT PERMANENT CUSTODY TO THE CLARK COUNTY DEPARTMENT OF JOB AND FAMILY SERVICES WAS IN THE BEST INTEREST OF THE CHILDREN AS SAID FINDING IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

II.   THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN ORDERING THAT ALL RIGHTS AND DUTIES OF THE MOTHER OF THE CHILDREN BE TERMINATED AS SAME WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 15} Under her First and Second Assignments of Error, Mother contends that the

juvenile court abused its discretion in granting permanent custody of her children to CCDJFS and terminating her parental rights. In support of this argument, Mother claims that the court's findings related to that decision were against the manifest weight of the evidence. We disagree.

{¶ 16} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing R.C. 2151.414(E). (Other citation omitted.) "The court's decision to terminate parental rights, however, will not be overturned as against the manifest weight of the evidence if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. We review the court's judgment on that matter for an abuse of discretion. *In re E.D.* at ¶ 7*,* citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

{¶ 17} We have also stressed that "issues relating to the credibility of witnesses and the weight to be given the evidence are primarily for the trier of fact." *In re A.J.S.*, 2d Dist. Miami No. 2007 CA 2, 2007-Ohio-3433, ¶ 22. The " 'rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony.' " *Id.*, quoting *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984).

{¶ 18} In this case, CCDJFS filed its motion for permanent custody pursuant to R.C. 2151.413(D)(1), which provides that "if a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child."

{¶ 19} "R.C. 2151.414 sets forth the procedures a juvenile court must follow and the findings it must make before granting a motion filed pursuant to R.C. 2151.413." *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 9. In addition to requiring a hearing, "R.C. 2151.414 establishes a two-part test for courts to apply when determining a motion for permanent custody to a public services agency." (Citation omitted.) *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 14. "The statute requires the court to find, by clear and convincing evidence, that: (1) granting permanent custody of the child to the agency is in the best interest of the child; and (2) either the child (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for twelve or more months of a consecutive twenty-two month period." *Id.*, citing R.C. 2151.414(B)(1). (Other citation omitted.)

{¶ 20} Here, Mother only challenges the juvenile court's finding that granting permanent custody to CCDJFS was in the best interest of her children, as the record is clear that E.S., D.H., and K.H. had been in the temporary custody of CCDJFS for 12 or

more months of a consecutive 22-month period.[1]  As a result, we need only consider the first prong of the two-part test, i.e., whether the evidence supports the juvenile court's findings about the children's best interests.  *See In re K.S.*, 2d Dist. Montgomery No. 26701, 2015-Ohio-4117, ¶ 8.

**{¶ 21}** Concerning a child's best interests, "R.C. 2151.414(D) directs the trial court to consider all relevant factors when determining the best interest of the child, including but not limited to: (1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable."  *In re S.J.* at ¶ 15.  "No one element is given greater weight or heightened significance*."  In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816 at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

*1.     Interaction and Interrelationship of Children with Parents and Foster Parents*

---

[1]As previously noted, the children were first removed from their parents' home in August 2013 by emergency removal and then adjudicated to CCDJFS's temporary custody in September 2013. The children remained in CCDJFS's temporary custody until December 15, 2014, and were then placed back in CCDJFS's custody on April 13, 2015.  The children have since remained in CCDJFS's temporary custody throughout the proceedings.   Therefore, the children were well within the "twelve out of twenty-two rule" when CCDJFS filed its January 28, 2016 motion for permanent custody.

{¶ 22} In its decision, the juvenile court examined Mother and Father's relationship with their children and concluded that there was no meaningful, emotional bond or harmonious relationship between them, as the court found that the parents merely interact as friends and visitation providers. Mother challenges this finding based on testimony from the CCDJFS caseworker and visitation specialist acknowledging that she had a strong bond and positive interactions with her children. She also points to testimony from the GAL indicating that she is good with the children and very involved in her case plan.

{¶ 23} While the record does contain testimony indicating that Mother bonded with her children and had positive interactions with them, there is also evidence indicating that said bond and interactions are limited to simple activities such as playing games and eating. The record further indicates that Mother's relationship with her children is consistently difficult due to her inability to address their emotional needs and manage their behavior.

{¶ 24} The visitation specialist testified that it was typical for the children to get upset and cry during visitations, and in response, Father would get agitated and occasionally leave the room, while Mother would get frustrated and call for a CCDJFS staff member to help her manage the children. The visitation specialist estimated that Mother required help during 30 out of the 40 visits she observed, even for minor issues, and noted that Mother requires more assistance than other visiting families. The visitation specialist also testified that Mother gets overwhelmed with her children and has difficulty addressing their emotional concerns and misbehaviors.

{¶ 25} The visitation specialist further testified that during the past few months, Mother and Father have become less engaged during visitations. According to the

visitation specialist, Mother and Father mostly sit and observe the children play with each other as opposed to providing one-on-one time with them. Video evidence of an April 16, 2016 visitation confirms this testimony.

{¶ 26} During the majority of the April 16, 2016 visit, the interactions between the parents and children were not very meaningful, as the children appeared more interested in independent play. The video showed that Father was agitated and abrasive during most of the visit and that Mother spent most of her time sitting at a table either eating with the children or doing a craft project, which she continued to work on even after the children lost interest. At one point, two of the children began to cry and Mother responded by remaining silent and continuing to work on the craft project. As the children cry, Father gets upset at Mother and said: "More worried about that than the kids huh?" Exhibit O— Job and Family Services Visitation DVD (April 16, 2016). Father then began to shout at Mother in front of the children because he felt he was the one blamed whenever something went wrong during the visitations. Mother remained passive throughout the ordeal and let CCDJFS staff intervene to diffuse the situation.

{¶ 27} The visitation specialist testified that during the April 16, 2016 visit, E.S. told mother he wanted to be adopted, which prompted Mother to cry. The GAL indicated that E.S. has not really bonded with Mother, has no bond with Father, and has told Mother that he hated her. Moreover, the visitation specialist indicated that D.H. usually keeps to himself during visitations, and both the visitation specialist and GAL testified that Father interacted and bonded with K.H. the most, but did not have a bond or interact much with the older children.

{¶ 28} The CCDJFS caseworker testified that the children are bonded to their

foster parents and the record indicates the children are thriving in their foster parents' care. The caseworker also indicated that one of the foster parents has expressed interest in adopting the children.

{¶ 29} Based on the foregoing testimony, we find there is clear and convincing evidence in the record supporting the juvenile court's finding that the children lack a harmonious relationship and strong emotional bond to Mother and Father, and have a positive relationship with their foster parents.

*2. The Children's Wishes*

{¶ 30} Regarding the children's wishes, the juvenile court deferred to the GAL's recommendation that the motion for permanent custody to CCDJFS be granted, as the GAL testified that reunifying the children with Mother and Father would be harmful for them.

{¶ 31} We note that R.C. 2151.414(D)(1)(b) "unambiguously gives the trial court the choice of considering the child's wishes directly from the child or through the guardian ad litem." *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816 at ¶ 55. Thus, "[t]he trial court has discretion to accept the testimony of the guardian ad litem on the child's wishes rather than hearing a direct expression of those wishes made by the child." *Id.* at ¶ 56. Additionally, the statute requires the court to consider the child's maturity when examining the child's wishes. R.C. 2151.414(D)(1)(b).

{¶ 32} While there is testimony in the record indicating that E.S. and D.H. told the GAL they wanted to go home to Mother and Father, the GAL explained that the children were not mature enough to fully understand their situation. For example, the GAL

testified that when she initially asked eight-year-old E.S. where he wanted to live, he told her "Heaven," which led her to believe that he lacked the maturity to state his wishes. Trial Trans. Vol. I (Apr. 7, 2016), p. 173-174. As previously noted, the record also indicates that during the April 16, 2016 visitation, E.S. told Mother that he wanted to be adopted. Documentation from E.S.'s school also indicates that when he was asked why he was behaving badly he responded, "I want to be adopted." State's Exhibit K – Springfield City Schools Manifestation Determination Review (Mar. 23, 2016), p. 2. Given the inconsistency of E.S.'s statements and the young age of all the children, we do not find that the juvenile court abused its discretion in deferring to the GAL's expression of the children's wishes and the recommendation that CCDJFS be granted permanent custody.

### 3. Custodial History

{¶ 33} Regarding custodial history, the juvenile court observed in its decision that all three children had been in CCDJFS's temporary custody ever since they were removed from Mother and Father's home in August 2013, with the exception of the four month period between December 15, 2014 and April 13, 2015. R.C. 2151.414(D)(1)(c). There is no dispute in the evidence as to this finding.

### 4. Children's Need for Legally Secure Permanent Placement

{¶ 34} As for the children's need for a legally secure permanent placement, the juvenile court found that there is no probability that Mother will be able to provide a safe, secure and appropriate home for her children. Although the juvenile court found that

Mother clearly loves her children, and there is evidence in the record demonstrating that Mother was able to provide them with food and shelter, the court believed that Mother could not otherwise meet the needs of her children or herself. The record supports this finding.

{¶ 35} The record indicates that Mother is limited in how she can interact with her children due to her extensive health problems, including morbid obesity, lupus, epilepsy, arthritis, seizures, depression, and a severe heart problem for which she will be receiving surgery. There is testimony in the record indicating that Mother's health issues are so severe that Father was concerned about leaving Mother home alone. The record also indicates that Mother tends to neglect her medical appointments and has failed to take her seizure and antidepressant medication.

{¶ 36} The record further indicates that when the children were in Mother's care between January and April 2015, Mother failed to fill the children's prescriptions and failed to ensure they were taking their medications regularly. During that time, the children were also not wearing their glasses, and as a result, they suffered significant deterioration in their vision causing them to need eye patches again. Moreover, it was reported that Mother and Father were not taking K.H. to his appointments at Early Head Start for his developmental delays. The caseworker from CCDJFS testified that Mother advised that she had stopped taking K.H. to Early Head Start because she felt K.H. no longer needed the treatment; although the record is clear that said treatment is pivotal to K.H.'s development.

{¶ 37} The record further indicates that Mother's mental challenges present a barrier to her being an effective parent who can provide a secure home. On the witness

stand, the juvenile court found Mother to be very slow to understand and respond to simple questions and to be childlike in her demeanor, noting that she functioned at a level only slightly above that of her children. Mother was evaluated by a private psychologist, Dr. Hrinko, in May 2014 and September 2015, and his evaluations revealed that Mother has a low IQ and problems regulating her moods, which causes her to experience depression, occasional thoughts of suicide, and periods of apathy, anxiety, and anger. Dr. Hrinko advised that when Mother is confronted with challenges she becomes easily overwhelmed, passive, and apathetic. His most recent evaluation of Mother stated that:

> [Mother] does have some difficulty with being able to identify needs, mobilize skills and resource, and proactively meet the needs of her children. Her own difficulty with moods and depression often interfere with her ability to perform these responsibilities. When she is monitored and supported, she is able to follow directions and meet the needs of her children. However, when left to her own devices, she fails to recognize the need to continue her own supports, identify the needs of her children, or to act proactively to meet the needs of her children.

State's Exhibit H – Psychological Evaluation (Sept. 27, 2015), p. 7.

{¶ 38} At trial, Dr. Hrinko opined that Mother has difficulty grasping the long-term consequences of her failure to make sure her children get the necessary treatment for their developmental delays. Given that Mother has not made substantial changes in her behavior between 2014 and 2016, Dr. Hrinko indicated that he is pessimistic Mother would ever make the necessary changes to be an appropriate parent and believed it was unlikely that her behavior would change in the future.

{¶ 39} Similarly, the GAL testified that she did not believe Mother could meet her children's needs and that it would be harmful for the children to be returned home. The GAL also testified that Mother does not grasp what being a parent to her children entails and that she does not understand the depth of the children's developmental and mental health problems.

{¶ 40} The visitation specialist at CCDJFS further testified that while Mother understands things such as feeding her children, she does not understand her children's emotional concerns. As previously noted, the visitation specialist testified that Mother gets overwhelmed during visitations because she cannot handle her children's behaviors and needs CCDJFS staff to assist her with her children on a regular basis. Similarly, the family therapist at Rocking Horse also expressed concerns that Mother is too "hands off" with her children, lacks discipline, and that she had unrealistic expectations of her children's abilities.

{¶ 41} The CCDJFS caseworker testified that she did not believe the children could safely be reunified with Mother. Despite Mother showing the caseworker that she could provide the children with food and shelter, the caseworker testified that there are too many barriers for Mother to consistently meet her children's needs on her own. Although the caseworker believes that Mother truly loves her children, she also believes that Mother does not comprehend the importance of the skills that CCDJFS puts in place, and that Mother fails to understand how important the developmental programs are for her children.

{¶ 42} In addition to the specific factors set forth in R.C. 2151.414(D), in determining the best interest of the children, the juvenile court also considered that

Mother has not substantially remedied the conditions that caused the children's removal, that there are no relatives that can care for the children, that the children have a reasonable probability of being adopted, and they would benefit greatly from a permanent and secure home. The court also noted that the children have been out of the home for the better part of two years and have no reason to return to the unsafe, unhealthy, and often violent home of their parents.

{¶ 43} Although Mother argues that she has a loving relationship with her children, was able to provide them with food and shelter, and actively participated in her case plan, this does not change the fact that the juvenile court's best interest findings are clearly and convincingly supported by the record. Moreover, contrary to Mother's claim otherwise, Father's death has no effect on the juvenile court's permanent custody decision, as Father's various issues with anger and abusive behavior were not the only problems in the household that led to the permanent custody decision. The juvenile court clearly found Mother to be troublesome as well, concluding that "the passive, docile, unfortunate, and unhealthy mother does not have the means or ability to provide for the children now or at any time in the reasonably near future." Judgment Entry (May 5, 2016), Clark County Juvenile Court Case Nos. 2015-459, 2015-460, 2015-461, Docket Nos. 63, 49, 45, p. 5.

{¶ 44} For the foregoing reasons, we find that the juvenile court weighed the relevant factors in R.C. 2151.414(D)(1), and in doing so, did not abuse its discretion in finding that granting permanent custody to CCDJFS was in the best interest of the children.

{¶ 45} Mother's First and Second Assignments of Error are overruled.

**Third Assignment of Error**

**{¶ 46}** Mother's Third Assignment of Error is a follows:

THE TRIAL COURT ERRED IN FAILING TO APPOINT AN ATTORNEY FOR THE CHILDREN WHEN THE CASA'S [GUARDIAN AD LITEM'S] RECOMMENDATION FOR PERMANENT CUSTODY WAS INCONSISTENT WITH THE CHILD'S WISHES.

**{¶ 47}** Under her Third Assignment of Error, Mother contends that the juvenile court should have appointed independent counsel for her children because the GAL's recommendation that permanent custody be granted to CCJFS was inconsistent with the children's wishes. In support of this claim, Mother relies on the GAL's testimony that E.S. and D.H. advised her that they wanted to go home to Mother and Father when she asked about their preferred placement. We disagree with Mother's claim.

**{¶ 48}** R.C. 2151.352 provides that "counsel must be provided for a child not represented by the child's parent, guardian, or custodian. If the interests of two or more such parties conflict, separate counsel shall be provided for each of them." In *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110, the Supreme Court of Ohio held that "pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *Id.* at ¶ 29. The Supreme Court, however, did not specifically detail what circumstances would give rise to the need to appoint counsel.

**{¶ 49}** "Courts applying *Williams* have noted that 'there is no need to consider the

appointment of counsel based upon a child's *occasional* expression of a wish to be with a parent or because of a statement made by an immature child.' " (Emphasis sic.) *In re J.W.*, 2d Dist. Clark Nos. 2013-CA-113, 2013-CA-114, 2014-Ohio-2814, ¶ 44, quoting *In re B.S.*, 5th Dist. Tuscarawas No. 11AP100041, 2012-Ohio-1036, ¶ 33, citing *In re Williams,* 11th Dist. Geauga Nos. 2002-G-2454, 2002-G-2459, 2002-Ohio-6588, ¶ 24 ("*Williams I"*).

{¶ 50} In *Williams I*, the Eleventh District explained that:

A juvenile court need only consider a child's wishes regarding a motion for permanent custody after giving due regard to the child's maturity. R.C. 2151.414(D)(2). Similarly, there is no need to consider the appointment of counsel based upon a child's occasional expression of a wish to be with a parent or because of a statement made by an immature child.

* * *

Indeed, in most cases, a child of tender years will probably lack the maturity to understand the situation and consequences involved in a permanent custody case. We are not requiring that legal counsel be appointed every time a child states a desire to remain with a parent. However, when a child consistently expresses a desire to be with a parent, then a juvenile court should investigate, giving due regard to the child's maturity and understanding of the proceedings, and make a ruling about whether an attorney should be appointed to represent the child's interest and expressed wishes.

*Williams I* at ¶ 24, 26.

{¶ 51} In *In re J.W.,* we addressed a situation similar to the present case wherein the parents contended that the trial court should have appointed counsel for their children because the GAL's recommendation to grant permanent custody to CCDJFS was inconsistent with the children's wishes to return home. We concluded that the trial court did not err in failing to appoint counsel for the children since the children's references to wanting to return home were only "occasional" and not repeatedly and consistently expressed. In so holding, we also considered the fact that the children did not regress in behavior after they were removed from their parents' home, but improved significantly in foster care. *In re J.W.* at ¶ 47-48.

{¶ 52} In this case, the record does not indicate that E.S., D.H. or K.H. repeatedly expressed a desire to return home to their parents. Rather, the GAL testified that she had asked E.S. and D.H. what their wishes were and that they had told her they wanted to go home to Mother and Father. The GAL did not ask K.H. the question because he was only four years old, and in her opinion, too young to understand. The GAL testified that she thought eight-year-old E.S. and six-year-old D.H. also lacked the maturity to completely grasp what she was asking them. As previously discussed, the GAL demonstrated this by explaining that when she initially asked the eldest sibling, E.S., where he wanted to live, he responded "Heaven." Trial Trans. Vol. I (Apr. 7, 2016), p. 173. From his response, the GAL gathered that E.S. did not fully understand the situation and lacked the maturity to state his wishes.

{¶ 53} Furthermore, during an April 16, 2016 visitation with his parents, E.S. told his Mother "I want to be adopted." *See* Trial Trans. Vol. II (April 21, 2016), p. 68.

Documentation from E.S.'s school also indicates that when he was asked why he was behaving badly he responded, "I want to be adopted." State's Exhibit K – Springfield City Schools Manifestation Determination Review (Mar. 23, 2016), p. 2.

{¶ 54} Also, as in *In re J.W.*, the children's behavior in this case did not regress after they were removed from their parents' home. Rather, the record indicates that the children exhibited significant improvements while in foster care and regressed when they were returned home between December 2014 and April 2015.

{¶ 55} Given that the children did not make repeated requests to go home and given the children's age, lack of maturity, and improvement in foster care, we find that the juvenile court did not err in failing to appoint independent counsel for the children. Accordingly, Mother's Third Assignment of Error is overruled.

## Fourth Assignment of Error

{¶ 56} Mother's Fourth Assignment of Error is as follows:

THE TRIAL COURT ERRED AND ABUSED IT'S DISCRETION BY FINDING THAT CLARK COUNTY CHILDREN SERVICES MADE REASONABLE EFFORTS TO INVESTIGATE AND/OR LOCATE ALTERNATIVE RELATIVE OR NON-RELATIVE PLACEMENTS FOR THE CHILDREN.

{¶ 57} Under her Fourth Assignment of Error, Mother contends that there is evidence in the record establishing that there are relatives and local individuals who would have taken custody of her children and that CCDJFS failed in its duty to investigate alternative placement with these individuals. As a result, Mother claims the juvenile court

abused its discretion in finding that CCDJFS made reasonable efforts to locate relative placement and believes this warrants a reversal of the grant of permanent custody to CCDJFS. We disagree, as the record belies Mother's claim.

{¶ 58} The CCDJFS caseworker testified that after the children were removed from Mother and Father's home for the second time in April 2015, Mother and Father provided potential relatives to CCDJFS and that CCDJFS tried to contact those individuals, but none of them were viable. Specifically, the CCDJFS caseworker provided the following testimony:

Q: Okay. Have—were there any other reasonable efforts the agency offered with respect to relative placements?

A: We did. We did—we—well, the first go around we asked for a list of relatives, declaration of relatives, and we were told most of the time no, none of my relatives are appropriate, you know, I'm not going to send them to my dad; I don't want to do that, I don't want to do this. They did give us one relative, but they never contacted us back. And so then when they came back into care, all the sudden there were a ton of relatives. So we did an ICPC on [Mother's] dad, and they denied that immediately. ICPC is interstate compact, and so we have to allow the other state to determine that. They immediately declined that. There were some local people that stepped forward, but they never did follow through. There was an aunt and uncle that stepped forward, but they didn't—Bethany contacted them several times and sent them letters, but they never

kind of followed through. They were very nervous. They had apprehension about if they got the children, they—they were concerned about [Mother and Father's] involvement in the future. They didn't—they were fine with taking care of the children. They didn't really want to have continued contact with [Mother and Father], and that was their apprehension.

Q: And those were the people from Texas?

A: Yes. They were supposed to come up and visit, and they never did. They had a business that was kind of interfering with that.

Q: So really the agency exhausted all relative options with respect to anyone they provided?

A: That's the reason it took so long to file [for permanent custody].

Trial Trans. Vol. II (Apr. 21, 2016), p. 42-43.

{¶ 59} Based on the foregoing testimony, the trial court's finding that the CCDJFS made all reasonable efforts to investigate relative placements was not an abuse of discretion. Regardless, we note that the juvenile court was not required to consider placing the children with a relative before awarding permanent custody to CCDJFS:

[T]he [permanent custody] statute does not require a juvenile court to consider relative placement before granting [a] motion for permanent custody. [See In re Dyal, 4th Dist. Hocking No. 01CA11, 2001 WL 925379 (Aug. 9, 2001)] * * *. In other words, a juvenile court need not find, by clear and convincing evidence, that a relative is an unsuitable placement option prior to granting the permanent custody request. Id. Relatives seeking

the placement of the child are not afforded the same presumptive rights that a natural parent receives as a matter of law, and the willingness of a relative to care for the child does not alter the statutory factors to be considered in granting permanent custody. [*See Dyal; In re Jefferson*, 9th Dist. Summit Nos. 20092 and 20110, 2000 WL 1587010 (Oct. 25, 2000); *In re Davis* (8th Dist. Cuyahoga No. 77124, 2000 WL 1513767 (Oct. 12, 2000)]. Rather, a juvenile court is vested with discretion to determine what placement option is in the child's best interest. * * * The child's best interests are served by the child being placed in a permanent situation that fosters growth, stability, and security. [*In re Adoption of Ridenour*, 61 Ohio St.3d 319, 324, 574 N.E.2d 1055 (1991)]. Therefore, courts are not required to favor a relative if, after considering all the factors, it is in the child's best interest for the agency to be granted permanent custody. [*See In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 64; *see, also, In re Dyal*; *In re Lewis*, 4th Dist. Athens No. 01CA20, 2001 WL 1468861 (Nov. 7, 2001); *In re Wilkenson*, 1st Dist. Hamilton Nos. C-010402, C-010408, 2001 WL 1220026 (Oct. 12, 2001] * * *.

*In re A.C.H.*, 4th Dist. Gallia No. 11CA2, 2011-Ohio-5595, ¶ 44. *Accord In re J.K.*, 4th Dist. Ross No. 11CA3269, 2012-Ohio-214, ¶ 30.

**{¶ 60}** Mother's Fourth Assignment of Error is overruled.

## Fifth Assignment of Error

**{¶ 61}** Mother's Fifth Assignment of Error is as follows:

THE TRIAL COURT ERRED IN FAILING TO PROVIDE AN ATTORNEY FOR MOTHER, [J.D.], AT THE ARRAIGNMENT AND DURING THE EXTENSION OF TEMPORARY CUSTODY PROCEEDINGS, AND ERRED IN NOT WAIVING THE RIGHT TO BIFURCATE THE DISPOSITIONAL PHASE OF THE PROCEEDING.

{¶ 62} Under her Fifth Assignment of Error, Mother contends that she was indigent and entitled to have an attorney appointed to her during the proceedings that involved the initial removal of her children in 2013. She also claims she was entitled to have the adjudicatory and dispositional proceedings from the 2013 case bifurcated. The 2013 case, however, was closed after legal custody was returned to the parents in January 2015. As a result, Mother cannot raise an issue concerning the 2013 case in an appeal from the instant 2015 case. The record of the proceedings in the 2013 case is not a part of the record on appeal. Furthermore, the record of the instant case indicates that on April 30, 2015, the juvenile court found that Mother was indigent and appointed her counsel before the custody determinations at issue were made. Accordingly, Mother's claims have no merit with respect to the present case.

{¶ 63} Mother's Fifth Assignment of Error is overruled.

### Conclusion

{¶ 64} Having overruled all five assignments of error raised by Mother, the judgment of the juvenile court granting permanent custody of E.S., D.H., and K.H. to CCDJFS is affirmed.

. . . . . . . . . . . . .

HALL, P.J. and FROELICH, J., concur.


Copies mailed to:

Megan M. Farley
Jennifer S. Getty
Hon. Joseph N. Monnin