[Cite as *In re O.D.- L.*, 2021-Ohio-79.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

IN RE: O.D.-L.

:
:
:       Appellate Case No. 28865
:
:       Trial Court Case No. 2018-1374
:
:       (Appeal from Common Pleas Court-
:       Juvenile Division)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 15th day of January, 2021.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, 5th Floor, Dayton, Ohio 45422
      Attorney for Appellee, Montgomery County Children Services

CRISTY N. OAKES, Atty. Reg. No. 0081401, 2312 Far Hills Avenue, Suite 143, Dayton, Ohio 45419
      Attorney for Appellant, Mother

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her child, O.D.-L., to Montgomery County Children's Services (MCCS). Mother filed a timely notice of appeal on August 6, 2020.

{¶ 2} O.D.-L. was born on September 5, 2017. He tested positive for controlled substances at birth and, as a result, he was removed from Mother's custody and placed on a safety plan with Maternal Grandmother.[1] MCCS eventually became concerned about Maternal Grandmother's custody of O.D.-L. and her understanding of his medical needs. Specifically, O.D.-L. suffers from hypoxic ischemic encephalopathy (HIE), an irreversible condition in which brain tissue is either missing or deteriorating. As a result of his condition, O.D.-L. is unlikely to ever be able to walk or speak. O.D.-L. was initially fed through an NG-tube, a device inserted through the child's nose down into his stomach. Eventually, a gastronomy tube (G-tube) was surgically inserted so that O.D.-L.'s food could be fed directly into his stomach.

{¶ 3} Because of his condition, O.D.-L. required the services of a full-time caretaker, and he had several weekly medical appointments. O.D.-L.'s brain damage has caused several other serious conditions, including cerebral palsy, quadriplegia, muscle spasms, seizures, kidney issues, urine-reflux issues, and trouble swallowing. Nevertheless, Maternal Grandmother informed MCCS that O.D.-L.'s medical issues were merely the result of his premature birth, and that she believed that O.D.-L. would

---

[1] As noted by the trial court, O.D.-L. has no legal father, although a particular man was alleged to be the child's father. MCCS met with the alleged father on two occasions and provided him with information regarding the case plan and court proceedings. However, the alleged father chose not participate in the case and never established paternity of O.D.-L.

eventually be able to play soccer. Maternal Grandmother also stated that O.D.-L. was able to focus on people, known as tracking, even though he could not. The record established that Maternal Grandmother also missed several of O.D.-L.'s medical appointments, informing MCCS that she was overwhelmed with the number of weekly appointments that she was required to attend with O.D.-L.

{¶ 4} On March 23, 2018, MCCS filed a complaint alleging that O.D.-L. was an abused, neglected, and dependent child; he was removed from the custody of Maternal Grandmother and placed in the interim custody of MCCS. On April 3, 2018, MCCS filed an amended complaint requesting temporary custody to Maternal Grandmother, or in the alternative to MCCS. At the adjudication hearing on May 16, 2018, the magistrate found O.D.-L. to be neglected and dependent, and the parties agreed to place O.D.-L. in the temporary custody of Maternal Grandmother.

{¶ 5} In October 2018, O.D.-L. was removed for a second time from the custody of Maternal Grandmother. MCCS caseworker Luke Conover testified that, during the six months before the second removal from Maternal Grandmother's custody, O.D.-L. had not gained any weight. This led MCCS to conclude that Maternal Grandmother did not appreciate the severity of O.D.-L.'s condition and that she was unable to properly care for him. Following the removal, O.D.-L. was placed with a foster family that was ultimately unable to meet his many needs. O.D.-L. was then placed with a second foster family, the Dimmicks, where he remained for the duration of the proceedings. The Dimmicks, however, are not a foster-to-adopt foster family.

{¶ 6} Prior to MCCS's seeking permanent custody of O.D.-L., Mother was placed on a case plan. Mother's case plan objectives were to get alcohol and/or drug treatment

and follow any recommendations, get a mental health assessment, attend parenting classes, attend O.D.-L.'s medical appointments, sign releases of information, meet with a caseworker monthly, attend visits with O.D.-L., and provide drug screens.

{¶ 7} The record established that Mother failed to complete a mental health assessment. Mother completed an alcohol and drug assessment at Family Services, but she failed to follow any recommendations based upon the assessment. Two drug screens were administered to her in 2018, and Mother tested positive on both occasions for methamphetamine and amphetamines, after which she simply refused to be tested again. MCCS informed Mother that a refusal would be considered as the equivalent of a positive drug screen, but Mother still refused to submit to any further testing.

{¶ 8} Conover testified that while he was O.D.-L.'s assigned caseworker, Mother attended only 50 to 65 percent of his medical appointments. MCCS caseworker Tairya Fields testified that, once she was assigned to O.D.-L.'s case, Mother attended only approximately ten percent of his medical appointments. Furthermore, Mother had not been properly trained to feed O.D.-L. through his G-tube because she failed to attend the appointments where she would have been trained.

{¶ 9} Significantly, on the days of her scheduled visits at MCCS, the foster mother fed O.D.-L., because Mother had not received the necessary training. Mother was also frequently late to the meetings. Conover testified that MCCS was also concerned with Mother's improper holding and support of O.D.-L.'s head and neck. Additionally, the police had to remove Mother and Maternal Grandmother from one meeting because they became disruptive.

{¶ 10} Fields testified that in February 2019, Mother began attending meetings

more frequently than she had previously. However, Mother refused to allow MCCS to enter her home, insisting on meeting with Fields outside. Thus, MCCS was unable to verify that Mother's home was safe and appropriate for O.D.-L.

{¶ 11} On August 19, 2019, MCCS filed a motion for permanent custody of O.D.-L. On November 5, 2019, Mother filed a motion requesting that legal custody be awarded to Maternal Grandmother. A hearing was held before the magistrate regarding both motions on November 5, 2019. The guardian ad litem (GAL) recommended that permanent custody of O.D.-L. be awarded to MCCS. On November 22, 2019, the magistrate granted MCCS permanent custody of O.D.-L. Mother filed objections to the magistrate's decision on December 4, 2019. Mother supplemented her objections on February 8, 2020. In a judgment issued on July 27, 2020, the juvenile court overruled Mother's objections and adopted the magistrate's decision awarding permanent custody of O.D.-L. to MCCS.

{¶ 12} It is from this judgment that Mother now appeals.

{¶ 13} Mother's first assignment of error is as follows:

MCCS DID NOT INVESTIGATE THE EXISTENCE OF OTHER RELATIVES, OTHER THAN MATERNAL GRANDMOTHER.

{¶ 14} In her first assignment of error, Mother contends that the juvenile court erred by granting permanent custody to MCCS because it did not fully investigate the possibility of placing O.D.-L. with relatives other than Maternal Grandmother.

{¶ 15} This court has held that the consideration of whether a child can be placed with a relative is not a statutory requirement. *In re R.L.*, 2d Dist. Greene Nos. 2012-CA-32, 2012-CA-33, 2012-Ohio-6049, ¶ 46. "That possibility is a matter that ought to be

considered in connection with the child's interaction and relationship with the child's parents, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child." *Id.*, citing *In re F.C.*, 2d Dist. Montgomery No. 23803, 2010-Ohio-3113, ¶ 24. Accordingly, the trial court had no obligation to consider placing O.D.-L. with a relative. *In re E.S.*, 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 59. Unlike biological parents, other relatives or friends seeking placement are not afforded special status or presumptive rights. *Id.* A trial court need not find a child's relative unsuitable before granting an agency permanent custody, and a court is not required to favor a relative where an award of permanent custody serves the child's best interest. *Id.*, quoting *In re A.C.H.,* 4th Dist. Gallia No. 11CA2, 2011-Ohio-5595, ¶ 44.

{¶ 16} Therefore, awarding permanent custody to MCCS without investigating all possible relatives for placement, standing alone, is not reversible error. Notably, Mother failed to identify any other suitable relative for placement.

{¶ 17} Mother's first assignment of error is overruled.

{¶ 18} Mother's second assignment of error is as follows:

THE COURT FAILED TO CONSIDER THE SUITABILITY OF MATERNAL

GRANDMOTHER AS A POSSIBLE CUSTODIAN FOR O.D.-L.

{¶ 19} In her second assignment, Mother argues that the juvenile court erred by failing to properly consider the suitability of Maternal Grandmother as a custodian for O.D.-L.

{¶ 20} However, " '[a] parent has no standing to assert that the court abused its discretion by failing to give the [grandparent] legal custody; rather, the challenge is limited to whether the court's decision to terminate parental rights was proper.' " *In re L.W.*, 8th

Dist. Cuyahoga No. 104881, 2017-Ohio-657, ¶ 23, quoting *In re S.G.*, 3d Dist. Defiance No. 4-16-13, 2016-Ohio-8403, ¶ 52, citing *In re Pittman*, 9th Dist. Summit No. 20894, 2002-Ohio-2208, ¶ 70. If permanent custody to the children services agency is in the children's best interest, legal custody to a relative necessarily is not. *In re V.C.*, 8th Dist. Cuyahoga Nos. 102903, 103061, and 103367, 2015-Ohio-4991, ¶ 60, citing *In re M.S.*, 8th Dist. Cuyahoga Nos. 101693 and 101694, 2015-Ohio-1028, ¶ 11.

{¶ 21} In the instant case, Maternal Grandmother was not hindered from asserting her rights at any point in the proceedings before the magistrate and the juvenile court. Maternal Grandmother intervened before the magistrate, filed her own motion for allocation of parental rights, and testified at the permanent custody hearing. Significantly, Maternal Grandmother failed to appeal the juvenile court's decision overruling her motion and awarding permanent custody of O.D.-L. to MCCS. Thus, Mother has no standing to assert Maternal Grandmother's interests as a potential custodian of O.D.-L. Rather, Mother's challenge to the juvenile court's judgment granting permanent custody to MCCS is limited to whether the trial court improperly terminated her own parental rights.

{¶ 22} Mother's second assignment of error is overruled.

{¶ 23} Mother's third assignment of error is as follows:

MOTHER WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL
BY HER TRIAL ATTORNEY'S FAILURE TO ASK MOTHER QUESTIONS
ABOUT HER CASE PLAN OBJECTIVES AND FAILURE TO OBJECT TO
INADMISSIBLE EVIDENCE.

{¶ 24} Mother argues that the she received ineffective assistance of counsel during

the permanent custody hearing. Specifically, Mother contends that her counsel was ineffective for the following reasons: 1) failing to ask Mother questions with respect to her completion of her case plan objectives; 2) focusing on Maternal Grandmother's ability to provide suitable care for O.D.-L., claiming that Maternal Grandmother's testimony was the "best evidence" of that; 3) failing to call Maternal Grandmother as a witness so he could have directly examined her; and 4) failing to object to a comment made by the magistrate during the permanent custody hearing.

{¶ 25} The test for ineffective assistance of counsel applied in criminal cases is equally applicable to permanent custody proceedings. *In re J.P.*, 2d Dist. Montgomery No. 27093, 2016-Ohio-5351, ¶ 65. Under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the represented party must demonstrate that counsel's performance was deficient and fell below an objective standard of reasonable representation, and that he or she was prejudiced by counsel's performance. *See also State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989). Proof of both parts of the test is necessary to establish the claim of ineffective assistance of counsel. *Bradley* at 142.

{¶ 26} The standards for ineffective assistance of counsel "do not establish mechanical rules"; rather, the focus is the fundamental fairness of the proceeding whose result is being challenged. *Strickland* at 670. To establish the first prong of ineffective assistance, there must be "a substantial violation" of one of counsel's essential duties to his or her client, *Bradley* at 141, and the adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings. *Strickland* at 688. Trial counsel is entitled to a presumption of competency. *State v.*

*Calhoun*, 86 Ohio St.3d 279, 289, 714 N.E.2d 905 (1999). To establish the second prong of ineffective assistance, the represented party must demonstrate that, but for counsel's errors, there is a reasonable probability that the result of the trial would have been different. *Strickland* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*.

{¶ 27} A represented party is not deprived of effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319, 528 N.E.2d 523 (1988). The test for a claim of ineffective assistance of counsel is not whether counsel pursued every possible defense; the test is whether the defense chosen was objectively reasonable. *Strickland*. A reviewing court may not second-guess decisions of counsel which can be considered matters of trial strategy. *State v. Smith*, 17 Ohio St.3d 98, 477 N.E.2d 1128 (1985). Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel, even if, in hindsight, it looks as if a better strategy had been available. *State v. Cook*, 65 Ohio St.3d 516, 524, 605 N.E.2d 70 (1992).

{¶ 28} Initially, Mother argues that her counsel was ineffective for failing to ask her questions about to her case plan objectives, including substance abuse treatment she received and her attendance of O.D.-L.'s medical appointments. At the permanent custody hearing, the following exchange occurred between Mother and her counsel during her direct examination:

Counsel: Okay. And, uh, do you know if your [Maternal Grandmother] has visited with [O.D.-L.] on a regular basis?

Mother: Yes, sir.

Q: Yeah. And, uh, at some of those visits did you also – or at some of those appointments or visits – uh, did you attend those appointments as well?

A: Um, [Maternal Grandmother] attends most of his medical appointments. Um, sometimes I haven't because I've been having a lot of car trouble myself. So, my car has just been a big, uh, pain in my butt, if you will.

Q: Now, during those – I want to say – I'll say the visitations – let's separate them. The visits, when she visits with [O.D.-L.] have you observed [Maternal Grandmother] to be appropriate?

A: Yes. Oh, yes.

Q: Nurturing?

A: Oh, yes. Definitely. [Maternal Grandmother] is a wonderful mother and a wonderful grandmother.

Q: Now, let's get back to the medical appointments. Was [Maternal Grandmother], during those appointments, appropriate?

A: And did she appear to understand the child's needs?

Q: Yes. She – she's very willing to understand, and she – she's, um, been trying to teach herself through, um, videos, how to do the G-tube and how it works, and how to properly care for O.D.-L. Um, yes, sir.

**{¶ 29}** Thus, the record establishes that Mother's counsel did, in fact, ask her about attending O.D.-L.'s medical appointments, and she clearly indicated that Maternal Grandmother attended the majority of the appointments because Mother's "car trouble" restricted her from attending on a regular basis. Additionally, the focus of the permanent

custody hearing from Mother's perspective was to establish that Maternal Grandmother could provide an appropriate and suitable home for O.D.-L. and properly provide suitable medical care for him. The purpose of Mother's testimony was to establish the basis for an award of custody to Maternal Grandmother, not Mother. Therefore, we fail to see how any questions relating to Mother's work on her case plan objectives or her attendance at a substance abuse treatment facility would have furthered that goal. Furthermore, given Mother's history of drug abuse and her previously discussed failure to complete her case plan objectives, it may have been counsel's strategy to avoid asking questions which could have damaged her case.

{¶ 30} Mother also argues that counsel's focus on questioning her regarding Maternal Grandmother's caregiving ability constituted ineffective assistance because Maternal Grandmother's own testimony was the "best evidence" of that. Again, the focus of the permanent custody hearing from Mother's perspective was to establish the basis for an award of custody to Maternal Grandmother. Mother even filed a motion to award custody of O.D.-L. to Maternal Grandmother. Additionally, Maternal Grandmother's testimony regarding her ability to provide a suitable environment for O.D.-L. was not the "best evidence" of her caregiving pursuant to Evid.R. 1002, nor was her testimony any more probative than the testimony of other witnesses who had observed her interactions with O.D.-L. The "best evidence" rule pursuant to Evid.R. 1002 stands for the proposition that an original writing or recording is the best evidence of its content. The rule does not state that one witness's testimony has more probative value than the testimony of another witness. Thus, Maternal Grandmother's testimony regarding her ability to care and provide for O.D.-L. was no more probative than Mother's testimony or the testimony of

any of the other witnesses regarding their observations of Maternal Grandmother's caregiving ability.

{¶ 31} Furthermore, Mother argues that counsel was ineffective for failing to call Maternal Grandmother as a witness so that he could have directly examined her. However, the record establishes the magistrate called Maternal Grandmother as a witness and examined her as if on direct, and Mother's counsel was given the opportunity to cross-examine Maternal Grandmother. Under the rules of evidence, "[i]n Ohio, cross-examination is not limited to the subject matter of direct examination. * * * It is available for all matters pertinent to the case that the party calling the witness would have been entitled or required to raise." *State v. Treesh*, 90 Ohio St.3d 460, 481, 739 N.E.2d 749 (2001). *Accord State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 128 (saying that "[u]nder Evid.R. 611(B), cross-examination is not limited to the scope of direct examination, but may cover 'all relevant matters' ").

{¶ 32} Accordingly, Mother's counsel was free to inquire of Maternal Grandmother regarding any subject he deemed to be relevant. Here, the record establishes that Mother's counsel questioned Maternal Grandmother regarding her ability to provide adequate care to O.D.-L., her ability to attend his medical appointments, and her willingness to take classes regarding O.D.-L.'s medical conditions. Since Mother's counsel was able to cross-examine Maternal Grandmother at the permanent custody hearing, Mother did not receive ineffective assistance based upon his initial failure to call her as a witness.

{¶ 33} Lastly, Mother argues that her counsel was ineffective for failing to object to a remark made by the magistrate during the following exchange during the permanent

custody hearing:

> The Court: Mother, do you need to leave?
>
> Mother: Yes, I do.
>
> The Court: Okay.   Thank you.
>
> Mother: I feel sick.
>
> The Court: You should feel sick.
>
> Mother: I feel sick.   [O.D.-L.] bonds with his mommy.   You guys are sick.

**{¶ 34}** The above exchange occurred during the testimony of O.D.-L.'s foster mother, who was describing the bond that had developed between O.D.-L. and all of the members of the foster family.   While the magistrate's remark was imprudent and unprofessional, the comment did not constitute evidence of any kind, and there is no indication that the juvenile court relied upon the comment in any way when it awarded permanent custody of O.D.-L. to MCCS.   There is no evidence in the record that Mother was prejudiced by the magistrate's comment.   Therefore, Mother's counsel was not ineffective for failing to object the magistrate's comment.

**{¶ 35}** Mother also argues that counsel should have objected when he was questioning Fields about alleged bruising suffered by O.D.-L. at the foster home, and the magistrate limited any further questioning by Mother's counsel regarding bruises.   The magistrate stated that the permanent custody hearing was not the venue for that type of inquiry, and there was another judicial process in place for that type of complaint. Additionally, prior to the magistrate's restricting any further questioning regarding bruising on O.D.-L., Fields testified that MCCS had sent nurses out to the foster home to investigate the cause of the bruising, and the foster family was found to have not been

responsible for the bruising. Thus, Mother's counsel was not ineffective for failing to object to the magistrate's decision to restrict further questions about O.D.-L.'s bruises, which had been found by MCCS to be unrelated to any care provided by the foster family.

**{¶ 36}** Mother's third assignment of error is overruled.

**{¶ 37}** Mother's fourth assignment of error is as follows:

THE TRIAL COURT ERRED WHEN IT GRANTED PERMANENT CUSTODY OF O.D.L. TO MCCS, WHEN THE BEST OPTION AVAILABLE WAS LEGAL CUSTODY TO MATERNAL GRANDMOTHER.

**{¶ 38}** "In a proceeding for the termination of parental rights, all of the court's findings must be supported by clear and convincing evidence." *In re M.S.*, 2d Dist. Clark No. 2008-CA-70, 2009-Ohio-3123, ¶ 15, citing R.C. 2151.414(E). A reviewing court will not overturn a court's grant of permanent custody to the State " 'if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements * * * have been established.' " *In re R.L.*, 2d Dist. Greene Nos. 2012-CA-32, 2012-CA-33, 2012-Ohio-6049, ¶ 17, quoting *In re A.U.*, 2d Dist. Montgomery No. 22287, 2008-Ohio-187, ¶ 9. We review the trial court's judgment for an abuse of discretion. *See In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48.

**{¶ 39}** As this Court has noted:

A children services agency that has been awarded temporary custody of a child may move for permanent custody. R.C. 2151.413(A). Before the court may award the agency permanent custody of a child, the court must conduct a hearing. R.C. 2151.414(A)(1).

A trial court may not grant a permanent custody motion unless the court determines that (1) it is in the best interest of the child to grant the agency permanent custody, and (2) *one* of the conditions set forth in R.C. 2151.414(B)(1)(a)-(d) exists.

(Emphasis added.) *In re J.E.,* 2d Dist. Clark No. 07-CA-68, 2008-Ohio-1308, ¶ 8-9.

{¶ 40} R.C. 2151.414 provides that, in finding that "the permanent commitment is in the best interest of the child" a court must consider all relevant factors, including the statutory factors listed in division (D) of the section: "(1) the interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child; (2) the wishes of the child; (3) the custodial history of the child * * *; (4) the child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and (5) whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable." *In re S.J.,* 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, ¶ 15.

{¶ 41} Regarding O.D.-L.'s interactions and interrelationships, his severe medical conditions render it difficult to establish whether he was bonded with anyone. O.D.-L. was unable to show many signs of affection and did not laugh. Conover testified that sometimes O.D.-L. simply lies in place without moving. Conversely, O.D.-L.'s foster mother testified that O.D.-L. had bonded with her family and that he smiled at them. The foster mother also testified that her other children listened to music with O.D.-L. and that he seemed very comfortable. The foster family also read him bedtime stories and was very sensitive to his needs.

{¶ 42} As previously stated, O.D.-L. tested positive for controlled substances at

birth, and as result, he was removed from Mother's custody and placed on a safety plan with Maternal Grandmother. MCCS eventually developed concerns regarding Maternal Grandmother's custody of O.D.-L. and her understanding of his medical needs. Because of the extent of his condition, O.D.-L. required the services of a full-time caretaker, and he had several weekly medical appointments due to conditions including cerebral palsy, quadriplegia, muscle spasms, seizures, kidney issues, urine-reflex issues, and trouble swallowing.

{¶ 43} Maternal Grandmother unrealistically believed that O.D.-L. would eventually be able to play soccer. Maternal Grandmother also believed tht O.D.-L. was able to focus on people, even though he could not. The record established that Maternal Grandmother missed several of O.D.-L.'s medical appointments and told MCCS that she was overwhelmed with the number of weekly appointments that she was required to attend with him.

{¶ 44} As previously stated, O.D.-L. was removed for a second time from the custody of Maternal Grandmother because he had not gained weight over a six-month period. This led MCCS to the conclusion that Maternal Grandmother did not appreciate the severity of O.D.-L.'s condition and that she was unable to properly care for him.

{¶ 45} We also note that while O.D.-L. was on the safety plan, Mother brought O.D.-L. to see his alleged father, who physically assaulted Mother in front of O.D.-L. As previously stated, the alleged father never sought to establish paternity and refused to participate in any of the proceedings.

{¶ 46} In contrast, Foster Mother testified that she had taken O.D.-L. to each of his approximately 150 medical appointments since he was placed in her care. Foster

Mother testified that she had learned about O.D.-L.'s medical needs and had experience in caring for him. Both Foster Mother and Foster Father had received G-tube training and could feed O.D.-L. properly. Foster Mother testified that O.D.-L. was on a daily schedule and very well cared for.

{¶ 47} R.C. 2151.413 dictates when a children services agency may seek permanent custody of a child. With some exceptions, R.C. 2151.413(D) generally requires a children services agency to pursue permanent custody of a child that has been in the agency's temporary custody for 12 or more months of a consecutive 22-month period. As noted by the juvenile court, on March 23, 2018, MCCS filed a complaint alleging that O.D.-L. was an abused, neglected, and dependent child, and he was removed from the custody of Maternal Grandmother and placed in the interim custody of MCCS. On April 3, 2018, MCCS filed an amended complaint requesting temporary custody to Maternal Grandmother, or in the alternative to MCCS. At the adjudication hearing on May 16, 2018, the magistrate found O.D.-L. to be neglected and dependent, and the parties agreed that O.D.-L. would be placed in the temporary custody of Maternal Grandmother. The juvenile court found that, pursuant to R.C. 2151.414(B)(1)(d), the date of the adjudication was the appropriate date from which to calculate the "twelve of twenty-two" requirement. On August 19, 2019, MCCS filed a motion for permanent custody of O.D.-L. O.D.-L. had therefore remained in the custody of MCCS throughout this time period, which clearly exceeded 12 months of the 22-month period and satisfied R.C. 2151.414(B)(1)(d).

{¶ 48} Finally, we agree with the juvenile court's finding that O.D.-L.'s secure placement could not be achieved without granting MCCS permanent custody. O.D.-L.

has been removed twice from Maternal Grandmother's custody.   The record established that Mother had failed to complete her case plan objectives.   Mother completed an alcohol and drug assessment at Family Services, but failed to follow any recommendations based upon the assessment.   She tested positive on two drug screens administered to her in 2018, after which she simply refused to be tested again.   MCCS informed Mother that a refusal would be considered as the equivalent of a positive drug screen, but she still refused to submit to further testing.

{¶ 49} Mother missed a large percentage of O.D.-L.'s medical appointments. Furthermore, she was not properly trained to feed O.D.-L. through his G-tube because she failed to attend the appointments where she would have been trained. There were also some issues with Mother's visitation with O.D.-L., including lateness, inability to feed or properly hold O.D.-L., and disruptive behavior, as described above.   Mother also refused to allow MCCS to enter her home, so MCCS was unable to verify that Mother's home was safe and appropriate for O.D.-L.

{¶ 50} It was clear that O.D.-L. required a legally secure placement and that such security could not be achieved without a grant of permanent custody to MCCS.   In other words, the juvenile court's finding that granting permanent custody to MCCS was in O.D.-L.'s best interest was supported by clear and convincing evidence, and no abuse of discretion is established.

{¶ 51} Mother's fourth assignment of error is overruled.

{¶ 52} All of Mother's assignments of error having been overruled, the judgment of the juvenile court is affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Cristy N. Oakes
B.D
D.L.
Michael Booher
Hon. Anthony Capizzi