[Cite as *In re S.Z.*, 2020-Ohio-3480.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY**

IN RE: S.Z.

:
:
:     Appellate Case No. 28745
:
:     Trial Court Case No. 2017-6604
:
:     (Appeal from Common Pleas Court-
:     Juvenile Division)
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 26th day of June, 2020.

. . . . . . . . . . .

MATHIAS H. HECK, JR., by JAMIE J. RIZZO, Atty. Reg. No. 0099218, Assistant Prosecuting Attorney, Montgomery County Prosecutor's Office, Appellate Division, Montgomery County Courts Building, 301 West Third Street, Dayton, Ohio 45422
     Attorney for Appellee, Montgomery County Children Services

JENNIFER A. COATNEY, Atty. Reg. No. 0075028, 223 North Broadway Street, Lebanon, Ohio 45036
     Attorney for Appellant, Mother

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Mother appeals from a judgment of the Juvenile Division of the Montgomery County Court of Common Pleas, which terminated her parental rights and granted permanent custody of her daughter, S.Z., to Montgomery County Children Services ("MCCS"). In challenging that judgment, Mother contends the trial court erroneously concluded that: (1) permanent custody in favor of MCCS was in S.Z.'s best interest; and (2) S.Z. could not be placed with either parent within a reasonable period of time or should not be placed with either parent. Mother also contends that the trial court should have found that it was in S.Z.'s best interest to be placed in the legal custody of a relative as opposed to MCCS. Mother further asserts that the trial court erred by failing to order MCCS to attempt to locate S.Z.'s father and to engage him in the agency's case plan. For the reasons outlined below, the trial court's judgment granting MCCS permanent custody of S.Z. will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} Mother had three daughters, R.T., born in 2012; K.Z., born in 2015; and S.Z., born in 2017. In 2013, the trial court granted MCCS permanent custody of R.T. due to Mother's lack of independent housing and income, her inability to demonstrate parenting skills, and her failure to address her mental health and substance abuse issues. *See* State's Exhibit H-1. At the time R.T. was removed from Mother's care, Mother was diagnosed as having personality disorder with obsessive-compulsive and narcissistic tendencies, mood disorder, alcohol abuse disorder, and cannabis abuse disorder. Mother also had a provisional diagnosis of bipolar disorder, alcohol dependency disorder, and cocaine abuse disorder. *See* State's Exhibit A.

{¶ 3} In 2016, the trial court granted MCCS permanent custody of Mother's second child, K.Z., for the same reasons it granted MCCS permanent custody of R.T., with the exception of the housing and substance abuse concerns. *See* State's Exhibit G. At the time K.Z. was removed from Mother's care, Mother was diagnosed with other specified personality disorder with narcissistic, histrionic, obsessive-compulsive, and schizoid features; disruptive mood dysregulation disorder, mild alcohol use disorder, and mild cannabis use disorder. Mother also had a provisional diagnosis of unspecified bipolar and related disorder, and mild cocaine use disorder. *See* State's Exhibit B.

{¶ 4} The instant matter concerns Mother's third child, S.Z., who is currently two and a half years old. Two days after S.Z. was born, MCCS filed a complaint requesting the trial court to adjudicate S.Z. dependent due to Mother's longstanding history with MCCS and due to the trial court's granting MCCS permanent custody of her other two children, R.T. and K.Z. MCCS also filed a motion requesting an ex parte order for interim temporary custody of S.Z. pending a hearing on the dependency complaint. The trial court administratively granted MCCS's motion for interim temporary custody the same day it was filed and held a shelter care hearing the following day. After the shelter care hearing was held, the trial court affirmed its order granting MCCS interim temporary custody of S.Z.

{¶ 5} On January 11, 2018, the trial court adjudicated S.Z. dependent and granted MCCS temporary custody of S.Z. until November 13, 2018. While in MCCS's temporary custody, S.Z. was placed in a foster home where she has remained ever since.

{¶ 6} On July 11, 2018, MCCS filed a motion requesting the trial court to issue an order granting MCCS permanent custody of S.Z. MCCS also filed a motion for a

reasonable-efforts bypass pursuant to R.C. 2151.419(A)(2)(e). Under that statute, an agency is not required to make reasonable efforts to return a child to his or her home if "[t]he parent from whom the child was removed has had parental rights involuntarily terminated with respect to a sibling of the child." R.C. 2151.419(A)(2)(e).

{¶ 7} On October 9, 2018, the trial court held a hearing on MCCS's motions. Following this hearing, the trial court found good cause to grant MCCS a reasonable-efforts bypass given that Mother had her parental rights terminated with regard to S.Z.'s siblings. The trial court also set MCCS's motion for permanent custody for trial on January 17, 2019. During that trial, MCCS presented testimony from S.Z.'s foster mother ("Foster Mother") and MCCS caseworker Patricia Wightman. Mother also testified on her own behalf. Their testimonies is outlined below.

*Foster Mother*

{¶ 8} Foster Mother testified that she and her husband had been S.Z.'s foster parents since S.Z. was two days old. Foster Mother also testified that she and her husband resided in a three-bedroom home where there was sufficient space for S.Z., who had her own bedroom. The foster parents worked full time, and Foster Mother testified that their income was sufficient for them to care for S.Z. and to pay for S.Z. to attend daycare while they were at work.

{¶ 9} Foster Mother testified that, every Friday, S.Z. was transported from daycare to a location where she had two hours of supervised visitation with Mother. According to Foster Mother, Mother had missed 18 out of 92 of those visits. Foster Mother also testified that Mother had missed several of S.Z.'s medical appointments. As of the date

of trial, Foster Mother testified that S.Z. had had eight baby wellness checks, two allergist appointments, and one eye appointment.   Out of those 11 medical appointments, Mother only attended one wellness check.   Foster Mother testified that she provided Mother's caseworker with advance notice of all the medical appointments and that Mother was specifically advised of the allergist and eye appointments at court.

{¶ 10} Foster Mother also testified that she kept a shared journal with Mother so that they could communicate with each other about S.Z.   Foster Mother testified that it concerned her that Mother did not write a lot of questions about S.Z. in the journal.   The shared journal was admitted into evidence as State's Exhibit L.

{¶ 11} Foster Mother further testified that S.Z. called her and her husband "mamma" and "dada."   Foster Mother testified that her mother, grandmother, and two siblings all lived nearby and that they all loved S.Z.   According to Foster Mother, S.Z. interacted with her (Foster Mother's) mother and grandmother as if they were S.Z's own grandparents.   Foster Mother testified that she and her husband would like to adopt S.Z., and that if the adoption took place, she would consider providing Mother with updates on S.Z.

*Patricia Wightman*

{¶ 12} Wightman testified that she had been the MCCS caseworker for S.Z. since S.Z. was born.   Wightman testified that she had been working with Mother since 2016, noting that she was also the caseworker involved when the trial court granted MCCS permanent custody of S.Z.'s sibling, K.Z.   Wightman testified that MCCS developed a case plan for Mother within 30 days of S.Z.'s removal from Mother's care; the objectives

in Mother's case plan were the same objectives that were in her prior case plans concerning her two older children, with the exception of the substance abuse objective, as substance abuse was no longer a concern for MCCS.

{¶ 13} Wightman described Mother's case plan objectives as follows:

(1) Attend mental health counseling and demonstrate proper stress management and coping skills;

(2) Follow all recommendations of counselor with regard to attending counseling and taking prescribed medication;

(3) Obtain appropriate housing;

(4) Attend parenting classes and demonstrate proper understanding of parenting and the child's development;

(5) Obtain sufficient income and properly manage income;

(6) Attend medical appointments and visitation with S.Z.; and

(7) Provide release of information forms.

{¶ 14} Wightman testified that the mental health objective in Mother's case plan had not been completed because Mother failed to regularly attend her mental health counseling at Samaritan Behavioral Health ("SBH"). Wightman testified that from May through December 2018, Mother had only attended three of her counseling sessions with SBH. Because Mother was not attending her appointments with the counselor who prescribed her medications, Mother was not getting her prescriptions and was not taking her medication regularly. According to Wightman, at the time of trial, Mother had been off her prescribed medication for two weeks.

{¶ 15} Wightman further testified that she had concerns about the parenting skills

objective of Mother's case plan. According to Wightman, Mother did not have an accurate understanding of S.Z.'s development, did not know what toys were appropriate for S.Z., and pushed S.Z. to reach milestones that S.Z. was not ready for or not yet working toward. For example, Wightman testified that Mother was trying to get S.Z. to walk with a push a toy at a time when S.Z. was not yet able to walk, thus making the toy unsafe for S.Z. to use. Wightman also testified that, in light of S.Z.'s food allergies, Mother was encouraged to bring appropriate foods for S.Z. to eat during her visits, but Mother failed to do so. According to Wightman, Mother fed S.Z. a pancake without first inquiring about S.Z.'s allergies. Wightman also had to discuss with Mother how to properly mix bottles of formula.

{¶ 16} With regard to the case plan objective requiring Mother to attend S.Z.'s medical appointments, like Foster Mother, Wightman testified that out of 11 medical appointments, Mother only attended one wellness check for S.Z. Wightman confirmed that she notified Mother of all S.Z.'s wellness checks as soon as they were scheduled. Wightman also testified that Mother was notified of S.Z.'s allergy appointments by phone and while at court. According to Wightman, Mother never complained that she was not getting information about S.Z.'s medical appointments. Instead, Wightman testified that Mother had said that she could not attend the appointments because she had to work.

{¶ 17} Concerning Mother's visitation objective, Wightman testified that starting on November 17, 2017, Mother was given two hours on Mondays and Fridays to visit S.Z. However, in June 2018, Mother's visitation was reduced to just one day a week because Mother's attendance at the visitations was sporadic. Like Foster Mother, Wightman testified that at the time of trial, Mother had missed 18 out of 92 visits. Wightman also

testified that Mother did not follow through with make-up visits and sometimes left visits early. Wightman further testified that Mother consistently looked at her phone during visitations and that Mother had to be redirected to engage with S.Z. Wightman claimed that she had never seen Mother read a book to S.Z. and that, during visitations, Mother and S.Z. often watched movies on a television that S.Z. could not view very well.

{¶ 18} As for Mother's housing objective, Wightman testified that Mother had been able to maintain a subsidized, two-bedroom apartment. Wightman also testified that Mother had appropriate food, clothing, and supplies for S.Z. However, with regard to the income objective, Wightman testified that, although Mother was employed, her income was insufficient to meet her and S.Z.'s needs. Wightman testified that Mother's income was $500 per month, and Mother had advised Wightman that she was struggling financially. Wightman also testified that Mother failed to complete budgeting forms provided by MCCS to assist Mother with managing her expenses.

{¶ 19} Based on the foregoing issues and concerns, Wightman testified that Mother had not completed her case plan objectives with MCCS. Wightman testified that she did not believe reunifying S.Z. with Mother was possible in the foreseeable future due to Mother's mental health issues, finances, and lack of understanding of how to parent a child. Wightman further testified that she would be concerned about S.Z.'s safety if placed in Mother's care.

{¶ 20} Continuing, Wightman testified that Mother provided MCCS with the name of the man who she alleged was S.Z.'s father. Wightman attempted to find S.Z.'s alleged father but was unable to locate him. Wightman did make contact with the alleged father's grandmother, who advised that she had not heard from the alleged father in

several months and that she believed he may have left Ohio. Wightman testified that she left a contact letter with the grandmother to pass along to the alleged father if she ever heard from him again.

{¶ 21} Wightman also testified to speaking with the alleged father's uncle. Wightman testified that the alleged father's uncle and grandmother wanted to know why MCCS was trying to find the alleged father. Wightman testified that she explained to them that she was attempting to find the alleged father in order to have him complete a DNA test to establish his paternity of S.Z. Wightman testified that a DNA test was scheduled to take place in May 2018, but neither the alleged father nor Mother attended. Wightman testified that the alleged father's relatives were concerned about S.Z. having a home and advised Wightman that they would be willing to step in and care for S.Z. if the alleged father's paternity was ever established. However, the relatives told Wightman that as long as S.Z. was being cared for, they were not going to intervene and would share the information with the alleged father if they ever heard from him.

{¶ 22} Wightman additionally testified that she asked Mother to provide names of relatives who might be able to care for S.Z. Wightman testified that she and a Court Appointed Special Advocate ("CASA") attempted to contact S.Z.'s maternal grandmother, but never received a response. Wightman also contacted S.Z.'s maternal uncle, who had previously expressed some interest in caring for S.Z. However, because the uncle did not have stable housing for himself, had concerns about being able to care for his own children, and was later arrested, Wightman no longer considered him a viable option. Wightman testified that Mother also directed her to contact the girlfriend of her maternal uncle. Wightman testified, however, that the girlfriend advised that she could not care

for an infant because she had young children of her own. Wightman therefore testified that she was unaware of any willing, able, or appropriate relatives to take permanent custody of S.Z.

{¶ 23} According to Wightman, granting MCCS permanent custody of S.Z. was in S.Z.'s best interest. Wightman testified that MCCS's permanency plan was to obtain permanent custody of S.Z., continue S.Z.'s foster placement with the foster family, and pursue adoption. Wightman testified that S.Z. was very comfortable and happy in her foster home and that she had no concern about S.Z.'s placement there. Wightman also testified that S.Z. was bonded to the foster family and their extended family. Wightman further testified that the foster family was addressing all of S.Z.'s needs and that S.Z. was meeting all of her developmental milestones in their care. Wightman testified that S.Z. was adoptable and that the foster family was a prospective adoptive family.

*Mother*

{¶ 24} While testifying at trial, Mother admitted that her mental health had been in decline ever since her oldest child was taken from her in 2013. Mother testified that she had mood swings and schizophrenia. However, Mother claimed that her mental health issues were not serious. Mother testified that she had been linked with SBH since February 2013, and that her counseling appointments at SBH were every two weeks, depending on her therapist's schedule.

{¶ 25} Mother testified that she took Latuda for her mood swings and schizophrenia and Lexapro to help her sleep. Mother admitted to telling her caseworker on January 11, 2019, that she had been off her medication for two weeks because her

prescription had run out. Mother claimed that this was the only time that she had been off her medication. Mother testified that she would get another prescription when she saw her counselor in February 2019, thus indicating her intent to go unmedicated until that time. Mother testified that she did "pretty well" without her medication. Tr. p. 103.

{¶ 26} Mother admitted that her visitation with S.Z. had been reduced from two days a week to one day a week due to her sporadic attendance. Mother also admitted to missing 18 visitations due to being sick. With regard to S.Z.'s medical appointments, Mother claimed that she was only notified of four appointments. Mother testified that she could only attend one of the four appointments because she had no transportation and had to work.

{¶ 27} Mother admitted to knowing that S.Z. had food allergies before she gave her a pancake at visitation. Mother further testified that at the time she gave S.Z. the pancake, she did not know exactly what foods S.Z. was allergic to. Mother claimed that she learned of S.Z.'s specific allergies to eggs, peanuts, and peas after she gave her the pancake. Mother testified that she had an order of eggs with the pancakes, but that she did not give S.Z. any of the eggs.

{¶ 28} Regarding her employment, Mother testified that she had two jobs at the time of the hearing. She worked at Valley Thrift Store, where she claimed to make $660 every two weeks. Mother, however, did not provide any paystubs verifying that employment. For her second job, Mother testified that she worked at Friendly Home Health Care, where she made $500 a month. Mother provided pay stubs to the court verifying that employment. *See* Mother's Exhibit 1.

{¶ 29} Mother testified that her employment at Valley Thrift Store covered her

utilities, rent, phone bill, and other expenses. Mother testified that she spent $125 a month for rent, $200 a month for Dayton Power and Light, $75 a month for Vectren, and $62 a month for her phone bill. Mother also testified that she spent approximately $200 a month for groceries, noting that she primarily got her food from food pantries. Mother testified that she completed the budget forms provided to her by MCCS, but that Wightman did not accept the forms because they were untimely.

{¶ 30} Mother testified that she worked at Friendly Home Health Care on Mondays, Wednesdays, and Thursdays from 8 a.m. to 11 a.m., on Tuesdays from 8 a.m. to 10 a.m., and on Fridays from 1 p.m. to 3 p.m. Mother testified that she worked at Valley Thrift Store on Tuesdays, Wednesdays, Thursdays, and Saturdays from 12 p.m. to 9 p.m. and on Sundays from 11 a.m. to 7:45 p.m. Despite working odd hours and having minimal income, Mother testified that she planned to enroll S.Z. in daycare while she was at work.

{¶ 31} Continuing, Mother testified that she last saw S.Z.'s father when she told him that she was pregnant in April 2017. Mother testified that S.Z.'s father denied the child was his. Mother did not communicate with S.Z.'s father again until she contacted him to tell him about the DNA test in May 2018, which neither she nor the child's alleged father attended. Mother claimed that she did not attend the DNA test because she was sick.

{¶ 32} Mother testified that MCCS did not consider placing S.Z. with a family member. Mother testified that S.Z.'s maternal grandmother, maternal great-grandmother, and her own "Aunt Noozie" all tried to contact Wightman about obtaining custody of S.Z., and that Wightman did not return any of their calls. Mother, however, acknowledged that her aunt was no longer able to care for S.Z. because she was going

to have her own child. Mother also acknowledged that her maternal great-grandmother was unable to care for a child. Mother additionally testified that she did not keep in contact with S.Z.'s maternal grandmother and did not "know what was going on with [her]." Tr. p. 96.

{¶ 33} Mother admitted that it was in S.Z.'s best interest for the foster family to be part of S.Z.'s life. Mother testified that S.Z. "need[ed] both parties to develop well." Tr. p. 87. However, at the same time, Mother testified that S.Z. should be placed in her custody because she was never given a chance to properly care for S.Z.

*Trial Exhibits and Guardian Ad Litem Report*

{¶ 34} At trial, the parties stipulated to a number of exhibits for the trial court to consider. The trial exhibits included two psychological and parental evaluation reports prepared by clinical psychologist Dr. Richard Bromberg in 2013 and 2016. *See* State's Exhibits A and B. The reports detailed Mother's principal and provisional mental health diagnoses and provided Dr. Bromberg's opinions on Mother's ability to parent.

{¶ 35} In the 2016 report, Dr. Bromberg stated that there was evidence to suggest that Mother had continued problems with:

(1)     Personality Disorder with Narcissistic Histrionic, Obsessive-Compulsive, and Schizoid features; Unpredictable and disruptive moods that are likely to include irritability, impatience, resentments, angers, demandingness;

(2)     A probability of denied substance abuse or denied potential for return to substance abuse;

(3)     Limited self-awareness and limited awareness of how her behavior impacts others;

(4)     Significantly rigid and unrealistic expectations for children's behavior and an unrealistically positive and grandiose self-appraisal of her own parenting abilities;

(5)     Possibility of a more significant psychiatric or substance abuse disorder;

(6)     A likely unwillingness to accurately report her or her child's needs which may interfere with accessing help or community resources when needed.

State's Exhibit B at p. 12.

{¶ 36} Dr. Bromberg also opined that Mother had:

consistent grandiosity in her mental functioning that prevents her from making an accurate assessment of her abilities, including her parenting abilities.   Based upon all available information, within a reasonable degree of psychological certainty, [Mother's] psychological problems, her impaired insight and judgment, her history of an unstable lifestyle, and her unreliable information regarding her parenting philosophy and practices, questions remain regarding her abilities to effectively and adequately take care of herself or her child on a consistent basis.

Id. at 13.

{¶ 37} Dr. Bromberg further stated his opinion that:

[Mother's] child [K.Z.] would be at risk as a result of [Mother's]

unrealistic and even grandiose self-assessment; her limited sensitivity to how her behavior impacts others; her unrealistic and significantly rigid expectations for children's behavior; and [Mother's] problems with unpredictable and reactive moods.

*Id.*

{¶ 38} In addition to Mother's mental health evaluations, the trial exhibits included records from Celebrating Families, an intensive parenting program where Mother attended parenting classes.   The Celebrating Families records indicated that, although Mother completed the program's parenting classes, the executive director of the program still had concerns about Mother.   Specifically, the executive director wrote a letter to Mother's case worker on September 20, 2018, stating that:

[Mother's] mental health issues inter fears [sic] with her ability to think clearly.   Many classes were difficult to conduct or impossible because [Mother] would get so agitated and would say such bizarre things that you were unable to get started on any topic.

State's Exhibit F.

{¶ 39} The trial exhibits also included attendance records from SBH.   Those records showed that between June and December 2016, Mother missed 7 out of 18 mental health appointments.   State's Exhibit I.   They also showed that between May 2018 and January 2019, Mother missed 6 out of 10 mental health appointments.   State's Exhibit J.

{¶ 40} The trial court also considered a January 14, 2019 report filed by S.Z.'s guardian ad litem ("GAL").   In the report, the GAL stated that S.Z. had a positive and

loving bond with her foster parents, who had S.Z.'s best interest in mind. The GAL reported no concerns with S.Z.'s foster parents and expressed the foster parent's wish to adopt S.Z.

{¶ 41} With regard to Mother, the GAL reported various concerns that she had with placing S.Z. in Mother's care. Specifically, the GAL stated that S.Z.'s health and safety would be at risk with Mother because Mother's mental health issues would severely interfere with her ability to care for S.Z. The GAL further reported that Mother's lack of personal insight, refusal to accept any personal responsibility, and her unwillingness or inability to acknowledge facts might have worsened over the past two years. The GAL also reported that Mother no longer believed that she needed to develop or improve her parenting skills or that she needed financial management assistance. At the conclusion of the report, the GAL recommended the trial court grant MCCS permanent custody of S.Z. with the goal for S.Z. to be adopted.

{¶ 42} On January 25, 2019, the presiding magistrate issued a decision granting permanent custody of S.Z. to MCCS. Mother thereafter filed timely objections to the magistrate's decision and requested leave to file supplemental objections. On July 19, 2019, Mother filed her supplemental objections. Thereafter, the trial court judge conducted an independent review of the matter and, on February 7, 2020, issued an order overruling Mother's objections and adopting the magistrate's decision to grant permanent custody of S.Z. to MCCS. In so holding, the trial court found by clear and convincing evidence that: (1) granting MCCS permanent custody was in S.Z.'s best interest; and (2) S.Z. could not be placed with either parent within a reasonable period of time or should not be placed with either parent.

{¶ 43} Mother now appeals from the trial court's decision granting MCCS permanent custody of S.Z., raising four assignments of error for review.

**First and Second Assignments of Error**

{¶ 44} Because Mother's first and second assignments of error are interrelated, we will address those two assignments of error together. Under these assignments, Mother challenges the trial court's findings that led to the termination of her parental rights. Specifically, Mother contends that the trial court erred in finding that: (1) permanent custody in favor of MCCS was in S.Z.'s best interest; and (2) S.Z. could not be placed with either parent within a reasonable period of time or should not be placed with either parent. We disagree.

{¶ 45} As a preliminary matter, we note that appellate courts review a trial court's judgment terminating parental rights for an abuse of discretion. *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7, citing *In re C.F.,* 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48. "An abuse of discretion is the trial court's ' "failure to exercise sound, reasonable, and legal decision-making." ' " *State v. Perkins*, 2d Dist. Montgomery No. 24397, 2011-Ohio-5070, ¶ 16, quoting *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62, quoting Black's Law Dictionary (8 Ed.Rev.2004). "Absent an abuse of discretion on the part of the trial court in making the ruling, its decision must be affirmed." *State v. Xie*, 62 Ohio St.3d 521, 527, 584 N.E.2d 715 (1992).

{¶ 46} The termination of parental rights is governed by R.C. 2151.414, which sets forth a two-part test for trial courts to apply when deciding whether to award permanent custody to a public services agency. *In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-

Ohio-2935, ¶ 14. First, the trial court must find by clear and convincing evidence that granting permanent custody to the agency is in the best interest of the child. *Id.* Second, the trial court must find by clear and convincing evidence that the child: (a) cannot be placed with either parent within a reasonable period of time or should not be placed with either parent if any one of the factors in R.C. 2151.414(E) are present; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period. *Id.*, citing R.C. 2151.414(B)(1). (Other citation omitted.)

{¶ 47} "In a proceeding for the termination of parental rights, all the court's findings must be supported by clear and convincing evidence." *In re E.D.* at ¶ 7, citing R.C. 2151.414(E). (Other citation omitted.) The court's decision to terminate parental rights will not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted). *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15.

{¶ 48} In this case, when applying the two part test in R.C. 2151.414(B)(1), the trial court found that: (1) granting MCCS permanent custody was in S.Z.'s best interest; and (2) S.Z. could not be placed with either parent within a reasonable period of time or should not be placed with either parent. As noted above, Mother is challenging both of these findings on appeal. We will now address each of these findings.

**(1) Granting Permanent Custody to MCCS Was in S.Z.'s Best Interest**

**{¶ 49}** When determining a child's best interest, R.C. 2151.414(D)(1) directs the trial court to consider all relevant factors, including but not limited to:

(a) The interaction and interrelationship of the child with the child's parents, relatives, foster parents and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e) Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

*See also In re S.J.*, 2d Dist. Montgomery No. 25550, 2013-Ohio-2935, at ¶ 15. "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 57, citing *In re Schaefer*, 111 Ohio St.3d 498, 2006-Ohio-5513, 857 N.E.2d 532, ¶ 56.

**{¶ 50}** Here, the record indicates that the trial court weighed all the factors under R.C. 2151.414(D)(1) and found that granting MCCS permanent custody was in S.Z.'s best

interest.    After reviewing each of the aforementioned factors, we find that there was clear and convincing evidence to support the trial court's best interest finding for the reasons outlined below.

*Factor (a): The interaction and interrelationship of S.Z. with S.Z.'s parents, relatives, foster parents and any other person who may significantly affect S.Z.*

{¶ 51} While it was clear that Mother loved S.Z. and was bonded to her, Mother's interaction with S.Z. had been minimal.    S.Z. was removed from Mother's care and placed in a foster home two days after she was born.    Since that time, Mother's visitation with S.Z. had been reduced from two days a week to one day a week due to Mother's sporadic attendance.    Therefore, Mother interacted with S.Z. only once a week for two hours.    Mother had missed 20% of her visits with S.Z., left visits early, and did not follow through with make-up visits.    When Mother did attend visits, she often watched movies or looked at her phone and needed to be redirected to engage with S.Z.

{¶ 52} With regard to S.Z.'s father, paternity had not been established.    The record indicates that S.Z. had never met or had any relationship with the man who Mother claimed was her father.    Despite MCCS's trying to locate the alleged father and despite Mother's advising the alleged father of the scheduled DNA paternity testing date, the alleged father continued to be absent from S.Z.'s life.

{¶ 53} On the other hand, S.Z.'s foster parents had been caring for S.Z. since she was two days old, and they hoped to adopt her.    The record indicates that S.Z. was bonded to her foster parents, who she called "mama" and "dada."    S.Z. was also bonded

to her foster mother's extended family and was treated like a grandchild by her foster mother's mother and grandmother. It is clear from the record that S.Z.'s foster parents were capable, loving caretakers who had S.Z.'s best interest in mind. The record indicates that S.Z. was on target developmentally and was flourishing in her foster parents' care.

{¶ 54} For the foregoing reasons, this factor weighed in favor of granting permanent custody to MCCS.

*Factor (b): The wishes of S.Z., as expressed directly by S.Z. or through S.Z.'s guardian ad litem, with due regard to S.Z.'s maturity*

{¶ 55} S.Z. was only 14 months old at the time of trial and therefore was too young to express her wishes with regard to custody. This factor is neutral.

*Factor (c): The custodial history of S.Z., including whether the S.Z. has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period*

{¶ 56} At the time of trial, S.Z. had not been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period. S.Z., however, had been in the temporary custody of MCCS since she was two days old and had lived with only one foster family. Because S.Z. had been in the temporary custody of MCCS for basically her entire life, this factor weighs in favor of granting permanent custody to MCCS.

*Factor (d): S.Z.'s need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to the agency*

**{¶ 57}** Mother had serious mental disorders that affected her ability to think clearly and prohibited her from understanding S.Z.'s developmental needs. The record indicates that Mother did not properly take her prescribed medications and did not regularly attend her counseling sessions at SBH. A psychological expert and Mother's MCCS caseworker both opined that placing a child in Mother's care would put the child at risk of harm. Indeed, the record indicates that Mother did not fully appreciate S.Z.'s allergies, had not attended a majority of S.Z.'s medical appointments, and was inattentive when visiting S.Z. The record further indicates that Mother's income was insufficient to care for herself and S.Z. Furthermore, given her financial situation and odd working hours, Mother had an unrealistic expectation of being able to enroll S.Z. in daycare while she was at work. For all the foregoing reasons, this factor indicates that S.Z. was in need of legally secure permanent placement that could only be achieved by granting permanent custody to MCCS.

*Factor (e): Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable*

**{¶ 58}** The factor under R.C. 2151.414(E)(11) was applicable in this case because Mother had her parental rights involuntarily terminated with respect to S.Z.'s two older siblings. Therefore, this factor weighed in favor of granting MCCS permanent custody of S.Z.

**{¶ 59}** After weighing the relevant factors under R.C. 2151.414(D)(1), we cannot say that the trial court abused its discretion in finding that it was in S.Z.'s best interest to award MCCS permanent custody, as there was clear and convincing evidence in the record to support that conclusion.

**(2) S.Z. Could Not Be Placed with Either Parent Within a Reasonable Period of Time or Should Not Be Placed with Either Parent**

**{¶ 60}** "R.C. 2151.414(E) provides that a trial court shall find a child cannot be placed with either parent within a reasonable time or should not be placed with the parents, if the court finds, by clear and convincing evidence, that one or more of 16 enumerated factors exist." *In re R.H.*, 2d Dist. Clark No. 2016-CA-68, 2017-Ohio-4012, ¶ 13. "Only one of the factors set forth in R.C. 2151.414(E) must be present to make a finding that the child should not be placed with the parents." (Citation omitted.) *Id.* Here, the trial court determined that five of the factors in R.C. 2151.414(E) were applicable. We address each of those factors separately below and find that there was clear and convincing evidence in the record to support the trial court's conclusion.

> *Factor (E)(1): Notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home*

**{¶ 61}** When determining whether the parents have substantially remedied those

conditions causing the removal of the child, the trial court "shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties." R.C. 2151.414(E)(1).

{¶ 62} In this case, the record indicates that Mother had not substantially remedied the conditions that caused the removal of S.Z. The most concerning condition related to S.Z.'s removal was Mother's mental health. It is clear from the record that Mother suffered from serious mental health issues for which she did not consistently receive treatment. Since 2013, MCCS had attempted to help Mother address her mental health issues by providing Mother with mental health case plan objectives that required her to attend counseling, take her prescribed medications, and engage in treatment recommended by her counselors at SBH. Mother, however, had continually failed to complete these objectives, not only in this case, but also in the prior cases concerning her two older children. The record additionally indicates that, despite taking parenting classes, Mother had not been able to demonstrate a proper understanding of parenting and child development. Mother's income was still insufficient to meet S.Z.'s needs.

*Factor (E)(2): Chronic mental illness, chronic emotional illness, intellectual disability, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time and, as anticipated, within one year after the court holds the hearing pursuant to division (A) of this*

*section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code*

**{¶ 63}** This factor applied because the record indicated that Mother had chronic mental health issues that were so severe that they made her unable to provide an adequate permanent home for S.Z.   As previously noted, Mother had been diagnosed with disruptive mood dysregulation disorder and other specified personality disorder with narcissistic, histrionic, obsessive-compulsive, and schizoid features.   Mother also had a provisional diagnosis of unspecified bipolar and related disorder.   According to expert clinical psychologist Dr. Bromberg, Mother's "psychological problems, her impaired insight and judgment, her history of an unstable lifestyle, and her unreliable information regarding her parenting philosophy and practices" caused him to question Mother's "abilities to effectively and adequately take care of herself or her child on a consistent basis."   State's Exhibit B.   Mother's mental health issues and her failure to consistently receive treatment indicated that she would not be able to provide an adequate permanent home for S.Z. at the time of the hearing or at any time in the foreseeable future.

*Factor (E)(4): The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child*

**{¶ 64}** This factor applies because the record indicates that Mother attended only 20% of her visitations with S.Z., left her visitations early, and did not follow through with make-up visitations.   The record also indicates that when Mother visited S.Z. she often

looked at her phone and had to be redirected to engage with S.Z.    In addition, the record indicates that Mother only attended one out of 11 medical appointments and did not fully appreciate S.Z.'s food allergies.    This factor also applied to S.Z.'s father, who had been completely absent from S.Z.'s life.

*Factor (E)(11): The parent has had parental rights involuntarily terminated with respect to a sibling of the child*

**{¶ 65}** This factor applies because, as previously noted, Mother had her parental rights involuntarily terminated with respect to S.Z.'s two older siblings, R.T. and K.Z.

*Factor (E)(14): The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect*

**{¶ 66}** While there was clear and convincing evidence to suggest that S.Z.'s father, by his absence, had demonstrated that he was unwilling to provide food, clothing, shelter and other basic necessities for S.Z., we do not agree that there was clear and convincing evidence to suggest that Mother had demonstrated such an unwillingness.    It was arguable, however, that Mother's consistent failure to regularly attend her mental health treatment at SBH and her failure to regularly take her prescribed medication demonstrated an unwillingness to prevent S.Z. from suffering emotional or physical abuse or neglect as a result of Mother's mental health issues.    Regardless, this factor need not be established because the factors under (E)(1), (E)(2), (E)(4), and (E)(11) of R.C.

2151.414 all supported the trial court's finding that S.Z. could not be placed with either parent within reasonable period of time or should not be placed with either parent.

{¶ 67} For the foregoing reasons, we find that the trial court did not abuse its discretion in finding that: (1) permanent custody in favor of MCCS was in S.Z.'s best interest; and (2) S.Z. could not be placed with either parent within a reasonable period of time or should not be placed with either parent. Therefore, the trial court properly granted MCCS permanent custody of S.Z., as both parts of the two-part test for granting permanent custody in R.C. 2151.414 were satisfied.

{¶ 68} Mother's first and second assignments of error are overruled.

**Third and Fourth Assignments of Error**

{¶ 69} Because they are interrelated, we will also address Mother's third and fourth assignments of error together. Under her third assignment of error, Mother contends that the trial court erred by failing to conclude that it was in S.Z.'s best interest to be placed in the legal custody of a relative as opposed to MCCS. Under her fourth assignment of error, Mother contends that the trial court erred in not requiring MCCS to attempt to locate S.Z.'s alleged father and to engage him in the agency's case plan. These arguments lack merit.

{¶ 70} As a preliminary matter, we note that a trial court does not have an obligation to first consider placing a child with relatives before awarding permanent custody to a children's service agency. *In re A.U.,* 2d Dist. Montgomery Nos. 20583, 20585, 2004-Ohio-6219, ¶ 36; *In re E.S.,* 2d Dist. Clark No. 2016-CA-36, 2017-Ohio-219, ¶ 59. "Unlike biological parents, other relatives or friends seeking placement are not

afforded special status or presumptive rights." (Citation omitted.) *In re T.S.*, 2017-Ohio-482, 85 N.E.3d 225, ¶ 18 (2d Dist.). Therefore, "[a] trial court need not find a child's relative or family friend unsuitable before granting an agency permanent custody, and a court is not required to favor a relative or friend where an award of permanent custody serves the child's best interest." (Citations omitted.) *Id.*

{¶ 71} In this case, not only was the trial court under no obligation to consider placing S.Z. with a relative, but the record indicates that no relative was willing or able to care for S.Z. at the time of trial. The trial court heard evidence establishing that MCCS attempted to contact S.Z.'s maternal grandmother, who never responded to any of MCCS's calls. There was also evidence that MCCS explored the possibility of placing S.Z. with her maternal uncle. The record indicates that MCCS ultimately concluded that the maternal uncle was not a viable option because he did not have stable housing, was concerned about being able to take care of his own children, and was later arrested. MCCS contacted the girlfriend of S.Z.'s maternal uncle, who advised MCCS that she could not care for an infant because she had young children of her own. Although Mother testified that her "Aunt Noozie" and maternal great-grandmother attempted to contact MCCS without receiving a response, Mother admitted at trial that these two individuals were unable to take care of S.Z.

{¶ 72} As for S.Z.'s alleged father, contrary to Mother's claim, there was evidence presented at trial establishing that MCCS made diligent efforts to locate him. After Mother provided MCCS with the alleged father's name, MCCS found the alleged father's grandmother and made contact with her. MCCS also communicated with the alleged father's uncle. The record indicates that MCCS made the grandmother and uncle aware

of S.Z. and the need to establish the alleged father's paternity. The record further indicates that MCCS provided the grandmother and uncle with contact information to pass on to the alleged father if they ever heard from him. The alleged father, however, never reached out to MCCS.

{¶ 73} While the alleged father's grandmother and uncle advised MCCS that their family would take care of S.Z. if the alleged father's paternity was ever established, at the time of trial, the paternity of S.Z. was still in question. The record indicates that even though Mother advised the alleged father of the DNA paternity test date, he failed to attend the test. The alleged father's failure to reach out to MCCS and failure to take part in DNA testing indicates that he had no interest in being a part of S.Z.'s life.

{¶ 74} For the foregoing reasons, the trial court did not abuse its discretion by concluding that it was in S.Z.'s best interest to grant permanent custody to MCCS as opposed to a maternal or paternal relative and in not requiring MCCS to make further attempts to contact the alleged father.

{¶ 75} Mother's third and fourth assignments of error are overruled.

## Conclusion

{¶ 76} Having overruled all four assignments of error raised by Mother, the judgment of the trial court granting MCCS permanent custody of S.Z. is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and FROELICH, J., concur.

Copies sent to:

Mathias H. Heck, Jr.
Jamie J. Rizzo
Jennifer A. Coatney
Lawrence Henke
Hon. Anthony Capizzi